[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Worley*, Slip Opinion No. 2021-Ohio-2207.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-2207

THE STATE OF OHIO, APPELLEE, *v.* WORLEY, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Worley*, Slip Opinion No. 2021-Ohio-2207.]

*Criminal law—Aggravated murder—Findings of guilt and death sentence affirmed.*

(No. 2018-0757—Submitted January 12, 2021—Decided July 1, 2021.)

APPEAL from the Court of Common Pleas of Fulton County,

No. 16CR000106.

_____

DONNELLY, J.

{¶ 1} Appellant, James Worley, murdered Sierah Joughin in July 2016. After a trial, a Fulton County jury convicted him of aggravated murder with an escaping-detection specification, kidnapping, felonious assault, possessing criminal tools, tampering with evidence, and having weapons while under a disability. Following the jury's recommendation of a death sentence, the trial court sentenced Worley to death.

{¶ 2} We now review Worley's direct appeal of right and, for the following reasons, we affirm his convictions and sentence of death.

## I. TRIAL EVIDENCE

{¶ 3} Evidence adduced at trial showed that Worley kidnapped, restrained, and killed 20-year-old Joughin between July 19 and 22, 2016, in Fulton County. He attacked Joughin as she was riding her bike home one evening. He then struck her on the head with his motorcycle helmet and dragged her into a cornfield. Worley handcuffed Joughin, left her in the cornfield, and drove his motorcycle home. He returned to the cornfield after dark in his pickup truck and took her to a barn on his property. He dressed Joughin in lingerie, bound her, and shoved a rubber dog toy into her mouth and tied it in place, causing her death by suffocation. He then buried her body in a nearby cornfield.

### A. *Joughin goes missing*

{¶ 4} In July 2016, Joughin was living on County Road 6 in a rural area in Fulton County. Her boyfriend, Joshuah Kolasinski, lived nearby on County Road 12.

{¶ 5} On July 19, around 4:00 or 5:00 p.m., Joughin rode her bike to Kolasinski's house. She left to ride back home around 6:45 p.m., with Kolasinski riding alongside her on his motorcycle part of the way. Kolasinski recorded two videos of Joughin on her bike during the ride. She was wearing sunglasses, athletic shoes, shorts, and a tank top, and she sat on a checkered dishtowel draped over her bike seat.

{¶ 6} After Kolasinski headed back to his home, Joughin continued riding toward her home. Around 7:20 p.m., a motorist named Mary Stine was driving south on County Road 6 when she noticed a bike lying beside the west side of the road in an open area before the rows of corn began. As Stine passed by, she saw a man bent over at the waist about two or three rows deep into the cornfield. She later told police that the man was Caucasian and was wearing red shorts and possibly a white shirt.

{¶ 7} Kolasinski spent the next couple of hours at his house with a friend. Around 8:00 or 9:00 p.m., Kolasinski texted Joughin, but he did not receive a reply. Kolasinski called Joughin's mother, Sheila Vaculik, around 9:30 p.m., who told him that Joughin's bike was not at the family's home. The two of them drove around in Vaculik's car looking for Joughin, but they did not find her. They stopped at the fire department, where Vaculik spotted a police officer sitting in a police vehicle. Vaculik spoke to the officer and explained that she was looking for Joughin and asked for help. Later in the evening, police informed Vaculik that there was police activity on County Road 6.

{¶ 8} Sometime after 7:00 p.m. on July 19, a local farmer named Troy Vandenbusche was driving south on County Road 6 when he noticed a helmet beside the east side of the road. On his way home, Vandenbusche stopped, picked up the helmet, and tossed it into the bed of his truck. The next morning, when Vandenbusche heard that there had been police activity on County Road 6 the previous evening, he turned the helmet over to law enforcement. The helmet had reddish-brown stains on the exterior and also on the inside lining. Subsequent testing indicated that the stains were blood.

*B. The likely abduction site is found*

{¶ 9} Jeremy Simon, an officer with the Fulton County Sheriff's Office, and his K-9 partner searched for Joughin's bike in the late evening hours of July 19 into the early morning hours of July 20. Shortly after midnight, while traveling north on County Road 6, Simon saw a small section of the cornfield on the east side of the road where, upon inspection, he noticed many disturbed cornstalks, a "strong smell of gasoline," a motorcycle tire track, and a box of fuses. He saw a pair of women's sunglasses lying on the road near the painted white fog line on the west side of County Road 6. He also found a purple mountain bike in the cornfield on the west side of the road.

{¶ 10} The bike was collected and upon inspection, officers observed reddish-brown stains on its handlebars and seat. Subsequent testing confirmed that the stains were blood. Joughin's mother and boyfriend identified the bike as Joughin's. Investigators also found a checkered dishtowel with a reddish-brown stain approximately 1,000 feet north of the County Road 6 abduction site.

{¶ 11} Later that morning, agents from the Ohio Bureau of Criminal Investigation ("BCI") arrived and assisted in the search for Joughin. BCI crime-scene specialist Megan Roberts noticed two areas in the cornfield on the west side of County Road 6 that were "consistent with paths or point[s] of entry or exit."

{¶ 12} In the west cornfield, agents found broken cornstalks, reddish-brown stains on some corn leaves, and pattern impressions in the loose dirt. About 20 feet into the same cornfield, Roberts found a green sock with reddish-brown stains on it. Approximately 35 feet south of that location, Roberts found a pair of men's sunglasses and an orange-handled screwdriver.

### C. Worley is interviewed

{¶ 13} On July 21, Dan Van Vorhis, an employee of the Ohio Adult Parole Authority who was assigned to the Federal Bureau of Investigation's ("FBI") violent-crimes task force, Major Matt Smithmyer of the Fulton County Sheriff's Office, and FBI Special Agent Devon Lossic went to Worley's property at 10627 County Road 6, which is near where Joughin disappeared, to ask whether Worley knew Joughin or whether he had any information regarding her disappearance. Van Vorhis testified that Worley was "very friendly" at first, and that he invited the group into his living room. For approximately 90 minutes, Worley described his activities on the evening of July 19. Van Vorhis recorded part of that interview.

{¶ 14} Worley gave the following account. Around 5:45 or 6:00 p.m. on July 19, he departed his property on his motorcycle, but the motorcycle stalled when he was driving on County Road U. He got the motorcycle running again, but it stalled once more when he was driving on County Road 6. He stopped near a

cornfield that abutted a wheat field, where he saw a blue bike and a light gray bike lying on the ground. He pulled his motorcycle into the cornfield out of view from the road because he planned on riding one of the bikes home. But he changed his mind and alternated between getting his motorcycle to start and riding it and pushing it home. He did not see anyone on his trip and got home around 10:00 p.m.

{¶ 15} Worley told the investigators that he lost some belongings when his motorcycle broke down. He volunteered that his helmet, fuses, a screwdriver, and sunglasses were missing. Worley asserted his innocence multiple times during the interview, but also asked whether the police had any evidence against him, such as fingerprints.

{¶ 16} Later on July 21, BCI Special Agent Thomas Brokamp was at the police command center when he "overheard a conversation regarding a guy wanting his helmet back." After hearing this, Brokamp and other FBI and BCI agents went back to Worley's house that day. The group talked with Worley on his property for the next 14 hours, off and on. This second interview was recorded by Brokamp and Van Vorhis.

{¶ 17} On the investigators' arrival, Worley was told that a black helmet had been found. Worley immediately stated that he wanted it back. When Brokamp said that the helmet looked like it had blood on it, Worley told the investigators that that was impossible. Later during the interview, Worley said that he still did not understand "this deal with [his] helmet * * * that [his] helmet [has] this lady's blood on it."

{¶ 18} Worley allowed the investigators to walk around his property, which consisted of a residence, two barns, a machine shop, and a trailer. BCI Special Agent Dave Hammond testified that when investigators walked into the north barn, Worley's "reaction to [them] being in there was a little unsettling or a little alarming." When another investigator approached a green crate in the barn and

lifted its lid, Worley "got very upset with him, * * * told him to close that, and then made [the investigators] all get out rather quickly."

{¶ 19} Van Vorhis testified that when they entered the north barn, Worley's body language and demeanor indicated his anxiety over where the investigators were looking. Before leaving the barn, investigators were able to see that the green crate contained many clear plastic bags filled with women's lingerie. Worley told the investigators that the bags contained lingerie that he would give to women he was dating.

{¶ 20} The sand floor in the north barn had been recently raked. Worley said that he had just cleaned it up in preparation to raise rabbits. Investigators found an inflated air mattress behind stacked straw bales. Worley told the investigators that the only DNA they would find on the mattress would be his mother's.

{¶ 21} Agent Brokamp informed Worley that a security video from the Evergreen High School complex—located on County Road 6 in between Worley's property and the site where he likely kidnapped Joughin—showed a motorcycle traveling north on County Road 6 on July 19. Despite this video, Worley initially stuck with his original story that he had returned home on his motorcycle around 10:00 p.m., that he had not driven it north on County Road 6, and that did not leave his property again that evening. He eventually admitted, however, that he had not told the truth because he felt that "ammo [was] being stacked against [him]."

{¶ 22} Throughout both interviews, Worley consistently denied having anything to do with Joughin's disappearance. At that time, Joughin's body had not yet been discovered.

*D. Worley's property is searched*

{¶ 23} While investigators were speaking with Worley at his property, a search warrant was secured and executed on the property.

### 1. North barn

{¶ 24} Investigators noticed recent tire impressions in the grass leading directly to the north barn on Worley's property. Inside the barn, investigators noted that a metal rake and a scoop shovel were leaning up against the north wall of the barn. After removing stacked straw bales inside the barn, investigators found a roll of black duct tape, a piece of a white rope, and a trash bag containing adult diapers. Investigators also discovered a carpet-lined chest freezer that had been buried into the floor. The floor of the freezer was wet and contained some straw. Investigators also found a motorcycle visor and what appeared to be a drop of blood on the south wall of the barn, approximately 33 inches above the floor.

{¶ 25} Inside the green crate, officers found more adult diapers, a bag containing bondage clothing and restraints, a roll of white clothesline, latex gloves, clear plastic bags containing women's lingerie and clothing, a piece of duct tape with straw, hair, and other debris adhering to it, brown rope, white socks, a bag for storing the air mattress, and a pink sex toy. The pink underwear had a reddish-brown stain on it that tested presumptively positive for blood.

### 2. Machine shop

{¶ 26} Inside a machine shop on the property, investigators found Worley's motorcycle, which had pollen and weeds stuck to it, adult diapers, a tool board that had a compartment for ammunition, handcuff keys, two sets of handcuffs with keys tied to them, a zip tie, and a bottle of bleach.

### 3. Residence

{¶ 27} While searching Worley's residence, BCI agents found additional adult diapers in the kitchen, living room, and two bedrooms. In the laundry room, Special Agent Roberts found a gray T-shirt, size XL, in the washing machine. Debris was present on the left sleeve, and the shirt was damp. Investigators recovered a dirty pair of men's black denim jeans from Worley's bedroom. Investigators also found a computer tower and a pair of black boots caked with

mud. Agent Roberts testified that Worley gave law enforcement the clothing he was wearing on July 19, which included a cream-colored XL shirt.

### 4. Worley's vehicles

**{¶ 28}** Worley's vehicles—a red Chevrolet S-10 pickup truck and a green Dodge Dakota pickup truck—were searched on July 21. Although it had not rained recently, the red pickup truck was wet and had standing water in its bed. Officers recovered the following items from the red pickup truck: a can of pepper spray in the driver's side door pocket, a black ski mask, work gloves, an ear warmer, a roll of duct tape, and seven 24-inch zip ties in the rear pocket of the passenger's seat, three of which had already been connected.

**{¶ 29}** From the green pickup truck, officers collected a white rope bundled with black electrical tape and zip ties under the driver's side seat and under the floor mat of the driver's seat.

**{¶ 30}** Agents compared standard impressions from the tires on Worley's red and green pickup trucks with cast-tire impressions from the County Road 6 crime scene and determined that the cast-tire impressions were consistent with the make and model of two tires on Worley's green pickup truck.

### E. Joughin's body is found

**{¶ 31}** On July 22, a volunteer searcher named Scott Hudik was driving south on County Road 7 when he noticed an area of disturbance in a cornfield on the east side of the road. Hudik noticed 18-inch-wide drag marks in the dirt. He followed the drag marks for about 20 to 25 yards when he noticed that the dirt looked as if "someone took a shovel, dug a hole, and reburied it." This was not the burial site, but as he was looking around the area, Hudik saw a "yellowish latex glove" lying on the ground in between the road and the cornfield. Subsequent DNA testing revealed that the glove contained a mixture of DNA profiles, with Joughin and Worley being included with an expected frequency of one in 6,000. The one-in-6,000-frequency statistic is considered a "lower frequency." The forensic

scientist who testified at trial explained that the frequency was lower due to the sample being a "partial profile."

{¶ 32} Later that day, investigators located the burial site on the west side of County Road 7. They located the site after noticing a peculiar "section of corn" where "maybe 3, 4 feet, * * * was missing out of the field." As investigators began excavating the site, they could smell decomposing remains.

{¶ 33} Joughin's body was covered in dirt with her wrists handcuffed behind her back, her ankles bound together with duct tape, and her feet bound to her hands with a rope. She was lying on her stomach with her head turned to the side. A rubber cone-shaped dog toy, which was secured with a shoelace tied at the back of her head, had been used to gag her and there was straw in her hair. She was dressed in a "lace colored brassiere, handcuffs, a rope, and an adult diaper." A key was attached to the handcuffs.

*F. The autopsy*

{¶ 34} Dr. Cynthia Beisser from the Lucas County Coroner's Office conducted the autopsy on July 25, 2016. She testified that Joughin was 5 feet 4 inches tall and weighed 122 pounds at the time of her death.

{¶ 35} Dr. Beisser testified that Joughin had a head wound high on the right side of her forehead, which had caused significant bleeding. There was a hairline fracture on Joughin's skull at the left occipital bone, and several contusions along her outer left leg. Dr. Beisser testified that the forehead wound and the skull fracture could have been caused by Joughin's being struck with a motorcycle helmet. She also testified that the fracture was recent and could also have been caused by Joughin's head hitting the roadway.

{¶ 36} Dr. Beisser measured Joughin's oral cavity and the dog toy and found that they were the same size. After removing the dog toy, Dr. Beisser noted that Joughin's upper left medial incisor was broken, and she opined to a reasonable

degree of scientific certainty that Joughin's tooth could have been broken by the dog toy when it was inserted into her mouth.

{¶ 37} Dr. Beisser testified that because Joughin's mouth was the same size as the dog toy, the dog toy filled her oral cavity completely and cut off her ability to breathe. Dr. Beisser stated that there would have been visible or audible signs of Joughin's distress while she struggled to breathe and that her death occurred within ten minutes from asphyxiation. Dr. Beisser opined to a reasonable degree of medical certainty that Joughin's death was caused by asphyxia due to the mechanical obstruction of her mouth.

*G. Evidence collection and analysis*

### 1. DNA testing

{¶ 38} BCI agents conducted DNA testing on a number of items collected throughout the investigation. BCI agents also tested fingernail clippings from Joughin's left hand. The BCI forensic scientist who testified at trial stated that Joughin "was included as the major contributor" and that Worley was excluded as a major contributor. The BCI analyst further testified that "[t]here was additional data that included a male contributor that was not sufficient for comparison." Bloodstains on the exterior of Worley's motorcycle helmet yielded a DNA profile consistent with Joughin, with an expected frequency of one in one trillion. This conclusion was significant because it means that over one trillion individuals would need to be tested to find that DNA profile. The helmet's unstained interior revealed a mixture of DNA profiles, and Joughin was included as the major contributor, with an expected frequency of one in one trillion. Worley was included as the minor contributor, with an expected frequency of one in 30 million. Bloodstained swabs from the checkered dishtowel that was recovered from the abduction site yielded a DNA profile consistent with Joughin, with an expected frequency of one in one trillion. DNA testing of the interior and thumb tip of the latex glove that was recovered near the site where Joughin was buried yielded a mixture of DNA

profiles, with Worley and Joughin being included with an expected frequency of one in 6,000.

{¶ 39} BCI also tested some of the items collected from Worley's north barn, including a swab of the bloodstain from the pink underwear, which yielded a DNA profile consistent with Joughin, with an expected frequency of one in one trillion. Investigators also had a roll of paper towels tested for Joughin's DNA. The paper towels also yielded a mixture of DNA profiles, with Joughin being included as the major contributor, with an expected frequency of rarer than one in one trillion. The air mattress also contained a mixture of DNA profiles, with Joughin being included as the major contributor, with an expected frequency of one in one trillion. The duct tape found in the green crate also contained a mixture of DNA profiles, with Joughin and Worley both being included in the mixture, with an expected frequency of one in 20 million.

## 2. Surveillance video and cellular-phone data

{¶ 40} A video camera from the Evergreen Elementary School recorded a motorcycle traveling north on County Road 6 at 7:19 p.m. on July 19, 2016. A video camera from the high school captured the same motorcycle heading south on County Road 6 around 10:00 p.m. The same video showed a vehicle traveling north on County Road 6 about nine minutes later. Testimony established that it takes approximately 4.5 minutes to drive the 3.5 miles from the school to Worley's house.

{¶ 41} Forensic cellular-phone evidence introduced at trial showed that Joughin's and Worley's cellular phones were in the area of the abduction site between 7:42 p.m. and 7:45 p.m. on July 19. Worley made a call from that area at 7:43 p.m. FBI cellular-data analyst Joseph Jenson testified that the evidence showed that between 8:01 and 8:05 p.m. "there are arcs [for both phones] in the same general area." Jenson could not conclude that the two phones intersected at the same spot because the "measurements" were taken at different times. Jenson

also determined that, at 9:13 p.m. on July 19, Worley's phone was in the area of the abduction site.

### 3. Worley's computer

{¶ 42} Detective Dave Morford, from the computer-crimes unit at the Toledo Police Department, testified that a forensic analysis of Worley's computer revealed that Worley visited a website called xvideos.com, which showed pornographic videos. In 2015 and 2016, Worley searched for videos using keywords such as "hogtyed [sic] teen," "bound," "beaten down teens," "forced teens," "stranded and forced," and "rough pick-ups." In one of the videos that Worley watched, the female participant was strangled with a tennis net.

{¶ 43} On July 18 and 19, 2016, Worley accessed a website called AliExpress.com and searched for "camisole tanks," "G string thongs," "wholesale women's bralette tops, underwear, women's lace strap backless rack chest sleepwear, cropped tank tops," and other lingerie.

### 4. Worley's financial records

{¶ 44} Bank statements showed that Worley's personal checking account was used to purchase items from AliExpress.com in January and February 2016. In addition, a checking account in the name of Worley's mother—which listed Worley as having a power of attorney regarding this mother—was used to purchase items from AliExpress.com in June 2015 and March 2016 and items from Wicked Temptations in May 2015.

### 5. Other evidence taken from Worley

{¶ 45} After Worley was taken into custody, investigators photographed various scratches and bruises on Worley's arms, shoulders, and neck and a cut on his finger. Worley's keychain contained a unique key that looked like the key to the handcuffs that had been found attached to Joughin's wrists.

### H. Worley's previous abduction attempt

{¶ 46} At trial, the state introduced testimony from Robin Gardner about her encounter with Worley on July 4, 1990. Gardner, who was 26 years old at the time, was riding her bike in a rural area around Lucas County. Approximately one mile from her house, a pickup truck struck Gardner from behind, running her into a ditch. When she saw the pickup truck, she realized that it was the same one that had passed by her just moments before traveling in the other direction.

{¶ 47} When Gardner stood up, the driver of the pickup truck—later identified as Worley—asked her if she was all right. Gardner testified that she "put her defenses down" and told him that she thought she was okay. Worley then hit Gardner on the back of her head with a hammer and put her in a stranglehold. He also held a screwdriver to her throat and threatened to kill her if she did not get into his truck. Worley overpowered Gardner, got her into his truck, and then attempted to get both of her hands behind her back and handcuff her, but he succeeded in placing a handcuff only on her right wrist.

{¶ 48} During the struggle, a motorcyclist saw the commotion and stopped to help Gardner. She was able to get out of Worley's pickup truck and run out into the street and up to the motorcyclist, who took her home. Later that day, Gardner identified Worley as her attacker. Law-enforcement officers were unable to unlock the handcuff attached to Gardner's wrist with keys available to them. Gardner suffered a skull fracture and a concussion from the hammer blow.

### I. Defense case

{¶ 49} Worley presented two witnesses in his defense. Mark Fauble, a high-school friend of Worley's, testified that they had remained in touch over the years. Fauble testified that in 2011 or 2012, he knew that Worley needed a new helmet, so he picked one up for Worley at an automotive swap meet. Fauble confirmed that the helmet recovered at the abduction site in this case looked like

the one he had given Worley. On cross-examination, Fauble testified that the helmet was new when he gave it to Worley.

{¶ 50} Jeffrey Whitaker, also Worley's high-school friend, testified that from 2010 to 2016, he saw Worley "sometimes every week or a couple times a month." They rode motorcycles together, and Whitaker was aware that in the summer of 2016, Worley's bike had some electrical or fuel issues. Although Whitaker said that the motorcycle "occasionally stalled at corners," he denied that it ever left them "stranded." On cross-examination, Whitaker said that he and Worley had watched pornography together, and that it seemed to him that Worley had "an idea" about creating a pornographic studio at his residence.

## II. PROCEDURAL HISTORY AND SENTENCING

{¶ 51} A grand jury indicted Worley on 19 felony counts, including two counts of aggravated murder. The indictment charged Worley with two counts of abduction (Counts 1 and 2), four counts of kidnapping (Counts 3 through 6), two counts of felonious assault (Counts 7 and 8), two counts of murder (Counts 9 and 10), two counts of aggravated robbery (Counts 13 and 14), one count of possessing criminal tools (Count 15), one count of gross abuse of a corpse (Count 16), one count of tampering with evidence (Count 17), and two counts of having a weapon while under a disability (Counts 18 and 19).

{¶ 52} Count 11 charged Worley with aggravated murder with prior calculation and design, in violation of R.C. 2903.01(A). Count 12 charged Worley with purposely causing Joughin's death while "committing or attempting to commit" kidnapping, in violation of R.C. 2903.01(B). Each aggravated-murder count included two death-penalty specifications: (1) that Worley committed the murder for the purpose of escaping detection, apprehension, trial, or punishment for another offense, in violation of R.C. 2929.04(A)(3), and (2) that Worley committed the murder in the course of committing the offense of kidnapping and that Worley was either the principal offender in the commission of the aggravated

murder or that he committed the aggravated murder with prior calculation and design, in violation of R.C. 2929.04(A)(7).  He pleaded not guilty to all the counts and specifications.

{¶ 53} The state dismissed Counts 13 and 14 before the case was submitted to the jury.  The jury returned guilty verdicts on all the remaining counts, including both death-penalty specifications.

{¶ 54} The trial court merged the prior-calculation-and-design-aggravated-murder charge (Count 11) into the aggravated-murder-during-a-felony charge (Count 12), and merged the second specification (R.C. 2929.04(A)(7)) into the first specification (R.C. 2929.04(A)(3)) before the sentencing phase began.  The state elected to proceed to sentencing on Count 12 and the first specification to that count.  As such, for purposes of capital sentencing, the jury considered only Count 12 (purposely causing the death of Joughin while committing or attempting to commit the crime of kidnapping, in violation of R.C. 2903.01(B)) and the sole aggravating factor associated with that count after merger (that Worley purposely caused the death of Joughin for the purpose of escaping detection, apprehension, trial, or punishment for another offense, in violation of R.C. 2929.04(A)(3)).  The jury recommended a sentence of death, and the trial court accepted that recommendation and imposed a death sentence.

{¶ 55} On the noncapital convictions, the trial court merged Counts 1 through 5 with Count 6 (kidnapping) and sentenced Worley to 11 years in prison on that count.  The court merged Count 7 with Count 8 (felonious assault) and sentenced Worley to 8 years in prison on that count.  The court merged Count 16 with Count 17 (gross abuse of a corpse) and sentenced Worley to 36 months in prison on that count.  The court merged Count 18 with Count 19 (having weapons while under a disability) and sentenced Worley to 36 months in prison on that count.  The court sentenced Worley to 11 months in prison for one count of possessing criminal tools (Count 15).  The court ordered that the sentences imposed for the

noncapital convictions be served consecutively, for an aggregate sentence of 25 years and 11 months. Worley appeals his convictions and sentence and raises 11 propositions of law.

## III. ANALYSIS

### A. Sufficiency of the evidence

{¶ 56} In his first proposition of law, Worley argues that the state failed to prove beyond a reasonable doubt that he committed the offenses of aggravated murder and kidnapping. For the following reasons, we disagree.

{¶ 57} The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). " 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." R.C. 2901.05(E). A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219.

{¶ 58} In Worley's sufficiency-of-the-evidence claim pertaining to his kidnapping conviction, he contends that the evidence did not sufficiently prove that he "engaged in sexual activity with Joughin." And in Worley's sufficiency-of-the-evidence claim pertaining to his aggravated-murder conviction for which he was sentenced to death, he contends that the evidence did not sufficiently prove that he was the perpetrator of the crimes or that he acted with a purposeful mens rea. His claims lack merit because when the evidence is viewed in a light most favorable to

the prosecution, it supports the jury's conclusion that Worley committed the crimes and the conduct underlying the capital specifications.

### 1. The state presented overwhelming evidence that Worley committed kidnapping

{¶ 59} Worley challenges the sufficiency of the evidence supporting his kidnapping conviction, arguing that the state failed to present sufficient evidence that he "engaged in sexual activity with Joughin." This claim fails for several reasons.

{¶ 60} Worley's claim is focused on Count 4 (kidnapping)—a count for which he was not sentenced to death and was merged with Count 6. Count 4 alleged that Worley, by force, threat, or deception, restrained Joughin's liberty "with the purpose to engage in sexual activity, as defined in Section 2907.01 of the Revised Code, with the other against the other's will," R.C. 2905.01(A)(4).

{¶ 61} Even if Worley had been sentenced for a violation of R.C. 2905.01(A)(4), Worley's argument would still be unpersuasive. Worley's contention that there was insufficient evidence that he "engaged in sexual activity with Joughin" is based on a faulty reading of that statute. R.C. 2905.01(A)(4) prohibits the removal or restraint of another for the purpose of engaging in sexual activity with the person and "requires only that the restraint or removal occur for the purposes of non-consensual sexual activity—*not that sexual activity actually take place*." (Emphasis added.) *State v. Powell*, 49 Ohio St.3d 255, 262, 552 N.E.2d 191 (1990), *superseded by constitutional amendment on other grounds as stated in Smith*, 80 Ohio St.3d at 102, 684 N.E.2d 668, fn. 4, and following *Jackson*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 62} Although Worley does not challenge the sufficiency of the evidence for Count 6, which was the kidnapping count that supported the aggravated-murder conviction for which he was sentenced to death, the evidence supporting Worley's conviction for Count 6 was overwhelming as well. Count 6 required proof beyond

a reasonable doubt that Worley, "by force, threat, or deception," knowingly restrained Joughin of her liberty "under circumstances that create[d] a substantial risk of serious physical harm." R.C. 2905.01(B)(2). The evidence showed that Worley used force when he attacked Joughin as she was riding her bike, that he restrained her at his property using rope and handcuffs, and that he shoved a dog toy into her mouth and tied it in place causing her to suffocate. Thus, we find ample evidence supporting Worley's kidnapping conviction.

## 2. The state presented sufficient evidence to establish that Worley committed aggravated murder during a kidnapping

{¶ 63} The jury found Worley guilty of purposely causing Joughin's death while committing the crime of kidnapping (R.C. 2903.01(B)) so that he could escape detection, apprehension, trial, or punishment for the kidnapping (R.C. 2929.04(A)(3)). Worley argues that the state failed to produce legally sufficient evidence that he purposely killed Joughin or that he was her "actual killer."

### a. Worley purposely killed Joughin

{¶ 64} "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). A defendant's purpose may be established by circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). "The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible to objective proof." *State v. Garner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995). Therefore, intent may be established from the surrounding facts and circumstances in the case. *Id*.

{¶ 65} Worley maintains that there was no evidence submitted at trial that he purposely suffocated Joughin. He argues that the jury could not infer his purpose in this case because (1) Joughin's death was not caused by a gunshot or knife

wound, (2) the state failed to prove an exact time of death, and (3) the state's "main argument on purposefulness focused on Joughin's broken front tooth."

{¶ 66} Worley's claims lack merit. First, Dr. Beisser concluded to a reasonable degree of medical certainty that the death in this case was caused by asphyxia due to mechanical obstruction of Joughin's mouth. During the autopsy, Dr. Beisser removed the dog toy used to gag Joughin and found that her upper left front tooth was broken. Photographic and video evidence of Joughin's last bike ride demonstrated that her teeth were intact prior to the abduction. Furthermore, Dr. Beisser testified to a reasonable degree of scientific certainty that the tooth could have been broken when the gag was inserted into her mouth.

{¶ 67} The dog toy and Joughin's oral cavity were the same size, and the gag was tied tightly in place with a shoelace. Therefore, when the gag was inserted and then secured in place, it completely blocked both of Joughin's airways and prevented her from breathing. Although Worley owned gear that was specifically made for sexual bondage that he could have used, he instead chose to use a dog toy, which was larger and differently shaped. He then secured that large dog toy with a shoelace. "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978); *see also State v. Carter*, 64 Ohio St.3d 218, 226, 594 N.E.2d 595 (1992).

{¶ 68} The evidence also indicated that Joughin's death was not instantaneous—it took up to ten minutes for her to asphyxiate from the time that Worley inserted the gag into her mouth. Dr. Beisser opined that there would have been visible or audible signs of Joughin's distress as she asphyxiated. Indeed, Dr. Beisser's testimony alone was sufficient for the jury to reasonably infer that when Worley pushed the gag into Joughin's mouth, he intended to kill her.

{¶ 69} Worley points out that no tooth fragment was found during the autopsy. Therefore, he contends, "[t]he most reasonable inference that a rational

trier of fact could reach was that [Joughin's] tooth was broken prior to the sex toy[1] entry, or after—as when she was buried—eliminating any reasonable probability that the toy was inserted into her mouth with the level of force showing a purpose to kill by suffocation." This assertion is meritless. The issue in a challenge to the sufficiency of the evidence is "whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at 273, 574 N.E.2d 492. The dispositive question is not, as Worley contends, whether there was a more reasonable inference the jury could have made. Moreover, the failure of the police to find a tooth fragment does not show that Worley did not intend to suffocate Joughin. The autopsy report established that Joughin died from asphyxia due to the dog toy's placement into her mouth.

{¶ 70} Worley lied to the investigators when they first came to his property and he continued to mislead the police for days after that initial visit. Although Joughin's body had not yet been located, Worley lied about his whereabouts on July 19 and lied about whether Joughin had ever been on his property. The state presented ample evidence showing that Worley made extensive efforts to escape detection, including lying, which also indicates that Worley purposely murdered Joughin. *See State v. Coleman*, 37 Ohio St.3d 286, 290-291, 525 N.E.2d 792 (1988).

{¶ 71} We reject Worley's arguments and hold that the state presented sufficient evidence that he purposely killed Joughin.

### b. *Evidence showing that Worley was the actual killer*

{¶ 72} Worley also argues that the state presented insufficient evidence to show that he actually killed Joughin. He contends that the evidence was insufficient to allow the jury to conclude that he was the "principal offender," an element of the

---

1. Worley's briefs persistently misidentify the object that suffocated Joughin as a "sex toy." In fact, it was a rubber dog toy with a conical structure.

aggravating circumstance contained in the second specification attached to both counts of aggravated murder.

{¶ 73} We find no merit to Worley's argument. After the court merged allied offenses and the state elected to proceed to the penalty phase with Count 12 and the first specification attached to that count, Worley was sentenced to death solely on that first capital specification, not the second specification (which required, among other elements, that there be sufficient evidence that Worley was the "principal offender"). *See* R.C. 2929.04(A)(7). Under the first specification—the only aggravating circumstance that the jury considered for sentencing purposes—Worley was found to have committed the aggravated murder for the purpose of escaping detection, apprehension, trial, or punishment for another offense that he had committed. R.C. 2929.04(A)(3). Thus, even if we were to hold that the evidence was insufficient to prove that Worley was the "principal offender," the erroneous verdict would be harmless beyond a reasonable doubt because the error would not affect the sentence. *Powell*, 49 Ohio St.3d at 263, 552 N.E.2d 191.

{¶ 74} We reject Worley's argument because he was not sentenced to death based on the principal-offender specification contained in R.C. 2929.04(A)(7), and he has not challenged the sufficiency of the evidence supporting the escaping-detection specification.

{¶ 75} Even so, there was overwhelming evidence that Worley was the perpetrator of these crimes and thus the "actual killer" and principal offender. Worley admitted to police that he was in the area of the abduction site on July 19, in the cornfield where a box of fuses belonging to Worley was found. He placed a call at 7:43 p.m. from that location. Joughin's blood was on Worley's helmet, which was found on the side of the road near the abduction site. And although Worley strongly denied that Joughin was ever at his property, her DNA was on the air mattress in his barn. The green crate contained a pair of pink underwear soaked

with Joughin's blood and a roll of paper towels in that crate also contained her DNA. All the DNA evidence found on Worley's property belies his claim that he was not her actual killer. His argument that a different perpetrator was likely involved because DNA analysis of Joughin's fingernail clippings revealed an unknown male's DNA profile is likewise meritless. Joughin was handcuffed and bound in a way that made her utterly defenseless. Thus, the fact that Worley's DNA profile was not detected from the DNA taken from underneath her fingernails does not support his argument.

**{¶ 76}** For the foregoing reasons, we reject Worley's first proposition of law.

### B. Denial of motion for new venire

**{¶ 77}** In his second proposition of law, Worley argues that his right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article I, Section 16 of the Ohio Constitution[2] was infringed upon when the trial court denied his motion for a new venire after many prospective jurors were, as he describes it, exposed to "information harmful to [him] and positive toward the government." But Worley fails to demonstrate that the trial court abused its discretion in denying his motion. The court dismissed every prospective juror who either stated that he or she had prejudged Worley's guilt or had unnecessarily commented on Worley's character. The trial court also issued timely and thorough admonishments and limiting instructions that the jurors swore they would follow.

---

2. "Since 1887, this court has equated the Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution with the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 15. Because we have not held that Article I, Section 16 of the Ohio Constitution provides broader due-process protections than the Fourteenth Amendment to the United States Constitution and because Worley has not actually provided this court with that argument, we decline to address that issue.

### 1. Facts

{¶ 78} The trial court ordered an initial draw of 400 individuals for the prospective jury pool. The court granted Worley's request for individual voir dire on the topics of pretrial publicity and the death penalty. The court dismissed about 156 prospective jurors after holding pretrial hearings on statutory juror excusals. The trial court placed the remaining 242 prospective jurors into two groups. General voir dire took place over the course of two days, and individual voir dire followed on the next day.

{¶ 79} On the first day of general voir dire, Worley's name quickly came up as the cause of a number of prospective jurors' inability to be fair and impartial. Prospective juror No. 96 said that he and Worley had attended the same high school, that he had spoken to a previous employer about this case, and that he could not be a fair and impartial juror despite the court's instructions. Defense counsel successfully challenged that juror for cause. After prospective juror No. 96 was dismissed, other prospective jurors stated that they too had already decided that Worley was guilty and could not fairly consider the evidence. Prospective juror No. 134 told the court that Worley used to come into the shop where she worked and that "we just kind of thought he was kind of different."

{¶ 80} When the court asked whether any of the prospective jurors had a "state of mind showing ill will, hatred, or bias" toward the state or Worley, prospective juror No. 60 raised her hand. She said that she had been "in the same friend group" with Joughin and that that relationship would make it impossible for her to be fair and impartial. The court dismissed that prospective juror for cause. Next, the court asked whether anyone had formed or expressed an opinion as to Worley's guilt. Prospective juror No. 18 stated that he had formed the opinion that Worley was guilty and that he would not be able to fairly and impartially consider the evidence. Prospective juror No. 65 stated that he believed Worley was guilty, prospective juror No. 62 lived near where Joughin's body was found and said she

could not be impartial, prospective juror No. 52 said that she could not be unbiased because of her friendship with the Joughin, Vaculik, and Kolasinski families, and prospective juror No. 102 said that he already made up his mind. The court dismissed all those prospective jurors for cause.

{¶ 81} Addressing the remaining prospective jurors, the court requested those who had a preconceived opinion about Worley's guilt to stand. The court then asked the prospective jurors who stood up whether they could set aside any preconceived judgments as to Worley's guilt and whether they could decide the case based only on the evidence that would be presented at trial. Prospective juror No. 4 revealed that Joughin's family had been to her wedding, and then said that "based on that he did this 30 years ago, it's been—" before the court interrupted her. The court instructed the prospective jurors to answer the specific question asked and to avoid making any additional statements.

{¶ 82} Defense counsel moved to dismiss the entire panel. After calling a recess, the court held a meeting in chambers. Counsel argued that prospective juror No. 4's allusion to Worley's prior conviction had tainted the venire and that a new venire should be empaneled. The state opposed the motion and pointed out that the parties had stipulated to the existence of Worley's prior conviction and that a witness would testify about it. The court then stated: "The Court is not going to dismiss this panel. The Court instead is going to give a curative instruction. * * * We will discuss with the jurors whether they can lay aside that comment and go forward from there. If there's an appearance that no one can lay it aside, then I will reconsider the defense's motion." The court also indicated that the jury commissioner had informed the court that prospective juror No. 159 "claims that Mr. Worley assaulted her daughter. She is convinced he committed this offense."

{¶ 83} The court dismissed prospective juror Nos. 4 and 159 and then instructed the jury as follows:

Everyone must understand that every individual charged with an offense in the United States is presumed to be innocent. That presumption carries to every defendant.

Comments made during voir dire are not evidence because, as I've said before, the only evidence that a jury may consider is the evidence that comes from the witness stand, from the exhibits; and from other things, quite frankly, [that] the Court tells you [that] you may consider, and from nowhere else, certainly not during voir dire.

So any comments you hear during voir dire related to something that someone supposedly did are just that. It's speculation, it's gossip. It's the stuff you read on the internet.

Because absent being present, none of you know for sure what occurred in this case. No one. And Mr. Worley is presumed innocent as any of you would be if you were accused of a crime. So I'm instructing all of you to disregard any of the comments that you've heard, and we're going to move forward.

{¶ 84} After issuing the curative instruction, the court again asked whether any of the remaining prospective jurors had a preconceived notion about Worley's guilt. Twenty-three prospective jurors raised their hands. The court conducted a brief colloquy with each prospective juror before dismissing each of them for cause.

{¶ 85} At the end of that day, the court admonished the remaining prospective jurors to abstain from advertising their being a part of the case on social media. Prospective juror No. 46 then raised a concern over a Facebook post she had made the previous day. The prospective juror said that she "had put on yesterday, that 'Oh, boy.'" The court stopped her and responded, "That was yesterday." Without inquiring further, the court asked prospective juror No. 46 to delete the post. She agreed to do so when she got home. She was later dismissed

without objection for having "made up [her] mind about [Worley's] guilt or innocence."

{¶ 86} The next morning, the court told counsel that 68 prospective jurors remained. During voir dire that morning, prospective juror No. 103 raised his hand and told the court that he did not think he "should be on the jury because [he] pretty much made up [his] mind about it." The court instructed the prospective juror to take his seat and told the prospective panel that the next step in voir dire would be focused on that issue. Yet, the prospective jurors continued to volunteer that their minds were already made up.

{¶ 87} In response, the court instructed the prospective jurors to consider two questions: "First, are you possessed of a state of mind showing ill will, hatred, or bias toward either the defendant or the State of Ohio? And, secondarily, have you formed or expressed an opinion as to the guilt or innocence of [Worley]?" The court then explained:

> If you become a juror in this case, you're going to take an oath. And the oath indicates that you will follow the instructions of the Court as to what it is you can consider in this case and how you will weigh the evidence in this case.
>
> And basically, what I'm going to tell you is, you have to consider only the matters that you hear here in the courtroom from the witness stand, the exhibits that are admitted, and anything else that I instruct you to follow.
>
> So what I want to know at this point in time, is there anyone here who cannot follow the instructions of the Court with respect to how they're to consider the evidence or who has already made up their mind with respect to the guilt or innocence of [Worley]?

Now, in doing this, all you have to tell me is you've made up your mind. I don't need any other editorial comments. We ran into some problems yesterday.

So those of you who would answer that question in the affirmative, would you please raise your hand?

In response, 20 prospective jurors told the court that they would not follow its instructions and had already made up their minds that Worley was guilty. During this process, prospective juror No. 397 said that he "went to Evergreen High School and lived three miles from the guy's house, and [Worley] attended our church after his first imprisonment 25 years ago."

{¶ 88} Defense counsel renewed their motion for a new venire after prospective juror No. 397's statement. The state opposed the motion, and the court took the motion under advisement. Eleven more prospective jurors stated that they had already decided the question of Worley's guilt. Prospective juror No. 250 said that he could not be impartial because he had "two little girls at home." The court then stopped the proceedings again to instruct the jury on a defendant's presumption of innocence, stating:

Couple of comments before we proceed further with voir dire. I'm certain that all of you understand that any individual accused of any offense has the presumption of innocence.

I believe the expression I heard yesterday was that the individual is cloaked with innocence if they're charged. And that individual remains innocent of the offense unless the State has proven the defendant's guilt beyond a reasonable doubt.

And until that moment, the defendant is entitled to the Constitutional presumption of innocence. Now some comments

may have been made today or you may have overheard something. None of what any of these prospective jurors has said in the courtroom is evidence.

The only matter that the jury can rely upon are those matters that are testified to in open court, the exhibits that will be received into evidence in this case, and your reliance on the Court's instructions.

You are all going to be placed under oath and promise to do those very things, promise to give that assurance to the defendant that he's presumed to be innocent until he's proven guilty by the State until and unless he is proven guilty by the State.

So I want to make certain that there is no one here who feels that they have somehow been biased by any comments that may have been made during this particular part of voir dire.

Is there any individual here who feels they cannot lay aside anything that they've heard here today and a [sic] render their verdict based on the instructions given to them by the Court, which is going to tell you you have to rely on the evidence you hear in the courtroom?

If there is, I want you to raise your hand at this time.

None of the prospective jurors raised their hand. After some follow-up general voir dire, the court denied Worley's motion for a new venire.

{¶ 89} Individual voir dire began on March 7, 2016. The court explained that individual voir dire was designed to ferret out the potential jurors' views on the death penalty and whether the potential jurors could apply the law as given to them by the court without regard to their personal views on capital punishment.

**2. Analysis**

**{¶ 90}** We will not presume that a venire is tainted when a prospective juror makes improper comments during voir dire. *State v. Sanders*, 92 Ohio St.3d 245, 248, 750 N.E.2d 90 (2001); *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 98 ("Absent some * * * indication, we decline to speculate that hearing [a prospective juror's] opinions must somehow have irretrievably tainted the other prospective jurors"). "The party challenging the entire jury panel has the burden to show either that the jurors were unlawfully impaneled or that the jurors could not be fair and impartial." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 150. And the trial court retains wide discretion over the conduct and scope of voir dire, including whether to grant a party's motion for a new venire. *See id.* at ¶ 150-151. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *See State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 48.

**{¶ 91}** The trial court provided limiting instructions to the prospective jurors more than once each day. Whenever a prospective juror failed to heed the court's instructions to answer "yes" or "no" to the questions and to refrain from any other commentary, the trial court stopped the proceedings and provided further instruction. Moreover, each of the jurors who were ultimately empaneled was subjected to individual voir dire in sequestered sessions with the court and counsel present. The court asked those jurors whether they had formed any fixed opinions regarding Worley's guilt or innocence, whether they could decide the case solely on the evidence presented at trial, and whether they could follow the court's instructions and deliberate in a fair and impartial manner. Following thorough questioning, the trial court excused members of the venire who had formed fixed opinions about Worley's guilt. And none of the prospective jurors who referred to Worley's prior conviction during general voir dire was seated on the jury.

{¶ 92} Citing *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), and *Bruton v. United States*, 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Worley argues in his reply brief that he has demonstrated an "overwhelming probability" that the venire could not have followed the court's curative instructions and admonitions. In support of his argument, he points to the inappropriate comments made by some prospective jurors concerning their preconceived notions of Worley's guilt.

{¶ 93} Worley's reliance on *Richardson* and *Bruton* is misplaced. Neither Supreme Court case involved a claim that prospective jurors' inappropriate comments during voir dire demonstrated an "overwhelming probability" that the venire could not follow the court's curative instructions. Both *Richardson* and *Bruton* involved Confrontation Clause violations due to the admission of a nontestifying codefendant's confession inculpating the defendant. *See Richardson* at 201-202; *Bruton* at 124. Here, there is no Confrontation Clause violation and no indication that the jurors could not follow the court's instructions and admonitions. The trial court gained the necessary assurances from every juror who served on Worley's jury. We reject Worley's claim that the trial court abused its discretion in denying his motion for a new venire.

### C. Ineffective assistance of counsel

### 1. During voir dire

{¶ 94} In his fourth proposition of law, Worley asserts that trial counsel provided ineffective assistance in violation of his Sixth and Fourteenth Amendment rights, as well as his rights under Article I, Section 10 of the Ohio Constitution. He alleges that during voir dire, defense counsel did not (1) elicit prospective jurors' "actual beliefs about imposing the death penalty" or (2) inform the prospective jurors of Joughin's age or that a homemade gag had been used to kill her. Worley also contends that the court's use of a hypothetical during voir dire further confused the potential jurors and that defense counsel should have objected to it.

{¶ 95} Reversal of a conviction on an ineffective-assistance-of-counsel claim requires the defendant to show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. The standard under the Ohio Constitution is "essentially the same as the one enunciated by the United States Supreme Court in *Strickland*." *Id*. at 142. To succeed on his claim, Worley must overcome "the strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance." *Strickland* at 689. The issue regarding counsel's performance for any ineffective-assistance-of-counsel claim is whether counsel's assistance was reasonable considering all the relevant circumstances. *Id*. at 688.

{¶ 96} This court has long "recognized that counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001); *see also State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 65 (in some cases, counsel may decide that the best tactic is to ask "few or no questions of a prospective juror"). In fact, " '[f]ew decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors.' " *Id*. at ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001).

a. *Failure to elicit prospective jurors' actual beliefs about the death penalty*

{¶ 97} Worley contends that defense counsel were ineffective during voir dire for failing to meaningfully examine the prospective jurors' views on the death

penalty. In support, he points to the voir dire of prospective juror Nos. 40, 42, 136, and 179.[3]

{¶ 98} During voir dire, the trial court and counsel questioned prospective jurors individually about their views on the death penalty. The court made the following statement to prospective juror No. 40:

This case is what we call a capital case. And that means because of the two counts of aggravated murder with which Mr. Worley is charged, there is the possibility and only a possibility of the imposition of the death penalty.

That's because each one of those counts of aggravated murder has attached to it certain specifications, and we call those specifications aggravating circumstances.

Do you understand that?

Prospective juror No. 40 responded affirmatively, and the court continued with that line of explanation and questioning:

It's these aggravating circumstances, these specifications, which make Mr. Worley potentially, and only potentially, eligible for the penalty of death.

Now, because of the possibility of the death penalty, it's important we ask every juror questions regarding his or her views on the death penalty. And it's equally important to remember that Mr. Worley is presumed innocent.

---

3. The portion of the transcript that Worley cites to reflects the individual voir dire of prospective juror No. 170, who sat as an alternate juror for Worley's trial and was substituted onto the petit jury prior to trial-phase deliberations. There was no juror No. 179 on the jury or who sat as an alternate juror.

Do you understand that?

Prospective juror No. 40 again responded affirmatively.

{¶ 99} Prospective juror No. 40 indicated on her questionnaire that the death penalty is appropriate in all cases in which the defendant is convicted of aggravated murder. In the blank lines left for explanation, she wrote: "Taking a life w[ith]out provocation should result in paying the penalty w[ith] their life." That being the case, the trial court explained that "the law does not necessarily—in fact, in many cases—does not state that to be the case." Prospective juror No. 40 indicated that she understood the court's statement and accepted it as true.

{¶ 100} The court then asked prospective juror No. 40 whether she understood that "it would not be automatic that if the defendant was convicted of aggravated murder, that you would automatically say he needs to be sentenced to death." The trial court also posed a question based on a hypothetical situation involving a defendant who had been convicted of aggravated murder and whose counsel presented certain mitigating factors during sentencing—i.e., "[t]he IQ of the individual, the age of the individual, the social background of the individual." When the court asked prospective juror No. 40 whether she could fairly consider mitigating factors in the event that Worley was convicted of aggravated murder, she stated that she "would be able to take those [mitigating factors] into consideration."

{¶ 101} Worley challenges defense counsel's follow-up voir dire, claiming that "[d]efense counsel asked no substantive questions after [the trial court's individual voir-dire] other than to repeat the [j]udge's instruction on the burden of proof for the government at the penalty and mitigation phases of the trial." Defense counsel questioned prospective juror No. 40 as follows:

Q. If I could briefly follow up that was a great summation by the Judge. Because in capital litigation, a capital murder case * * * [t]his is the only time in Ohio criminal law that the jury hears and gives a sentence. It doesn't happen in a drug case or DUI or something like that. It's the only time.

And to get there, you first have to find the defendant guilty of aggravated murder. And then after that and with the specifications, you go to the sentencing phase. And then would you be able to follow the law and listen to everything and then make that weighing process.

Has the State proven beyond a reasonable doubt [that] the aggravating circumstances outweighing [sic] the mitigating factors?

Can you do that?

A. Yes.

Q. So you're not going to be one to go, "Aggravated murder? Death, check."

A. No.

Q. Okay. And, ma'am, you hold certain beliefs close to your heart. I think I can see that.

A. Yes.

Q. Okay. And if it's 11 to 1 and you believe the State has not proven that, are you willing to tell everybody, "I'm standing for myself?"

A. Yes. I can give you a back story about that if you like.

Q. That's ok.

A. I've been given a very, very difficult time about having jury duty. I had no idea what the case was. And people keep telling me to get out of it, and I said that is our right as an American citizen.

It just makes me angry that people think that they have to get out of it.

Q. There is only one greater service you can provide to this country, and that is military service. And then possibly the only thing greater is giving your life on behalf of our nation. And I thank you, ma'am. Thank you, because you just showed me what you can do. Everyone told you to leave. Everyone told you to get out of this.

And do you know what you said?

A. "No. That's my duty."

{¶ 102} Defense counsel's voir dire was not deficient. In addition to revealing her character trait of standing up for her decisions in the face of opposition from family and friends, counsel's questioning of prospective juror No. 40 elicited her unequivocal assurance that she would not automatically recommend a death sentence. We have held that "not questioning certain members of the venire or asking too few questions of prospective jurors falls within the wide range of reasonable professional assistance." *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 45. Moreover, the prospective jurors were subject to questioning from both the bench and the prosecutor. Defense counsel has no duty to ask further questions during voir dire on topics that have already been sufficiently addressed. *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 65.

{¶ 103} Reasonable professional assistance may also include a decision by defense counsel not to object to the court's use of a hypothetical situation involving a capital sentencing hearing. *See State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 132; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 70. The hypothetical question addressed a primary issue: whether a

juror would automatically sentence Worley to death if he were convicted of aggravated murder, regardless of any mitigation factors presented. Even if the trial court's use of a hypothetical question was error, defense counsel's failure to object, without more, will not sustain a claim of ineffective assistance of counsel. *See State v. Fears*, 86 Ohio St.3d 329, 346-347, 715 N.E.2d 136 (1999); *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988).

{¶ 104} Counsel's and the court's voir dire of prospective juror Nos. 42, 136, and 170 was similar to the voir dire of prospective juror No. 40. Prospective juror Nos. 42, 136, and 170 never indicated, either in voir dire or on their death-penalty questionnaires, that they believed that the death penalty was appropriate in every case in which an individual is convicted of aggravated murder. The court asked prospective juror No. 42 about an answer on his questionnaire that revealed the prospective juror's belief that the death penalty is a proper punishment with exceptions: "Are you telling me that in each case of aggravated murder, you believe the individual should be sentenced to death?" Prospective juror No. 42 unequivocally denied that he believed this. And when defense counsel questioned prospective juror No. 170, she maintained that "whatever the law prescribes that [she] do in [the] courthouse, [she] would follow the law."

{¶ 105} Defense counsel's questioning in all three cases was brief. But Worley fails to cite any authority to demonstrate that brevity in questioning prospective jurors is a basis on which to find deficient performance. In addition, Worley cannot show that defense counsel's voir dire prejudiced him in any way.

### b. Failure to "lay the factual groundwork"

{¶ 106} Worley contends that the specific facts of this case—that Joughin was "a young woman killed as she was entering adulthood" and that "[h]er death was caused by a sex toy"—should have been explored with the prospective jurors during voir dire and that counsel's failure to do so was unreasonable and

prejudicial. He also asserts that defense counsel should have "objected to the absence of such questions."

{¶ 107} Here, Worley argues that defense counsel were ineffective because they did not request the court to allow specific questions regarding the facts of this case. The law does not require defense counsel to ask particular questions of every prospective juror. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 61. The jury-selection process is inherently subjective; it is based on intangible factors and the experience and intuition of trial counsel. *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 64. Accordingly, "it is for [trial] counsel to determine what questions should be asked on voir dire." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139.

{¶ 108} The trial court began the voir dire process by informing the venire of the charges that Worley faced, which included aggravated murder. The prospective jurors knew that Joughin was the victim of the alleged crimes. Because this ineffective-assistance-of-counsel claim is based on counsel's failure to act, Worley can only speculate that informing the jurors of the specifics of the murder would have resulted in a different jury and that the different jury would not have sentenced him to death.

{¶ 109} Worley has not shown that defense counsel were ineffective during voir dire. Accordingly, we reject Worley's fourth proposition of law.

### 2. During the state's closing argument

{¶ 110} In his third proposition of law, Worley argues that defense counsel were ineffective by failing to object to the prosecutor's "material misstatements" about the evidence during the trial-phase closing arguments. Worley contends that the state improperly argued that Worley's intent to kill was proved by his insertion of the dog toy into Joughin's mouth. According to Worley, the state did not "present evidence that the [dog] toy caused the broken tooth, only that it could have."

**{¶ 111}** It is true that Dr. Beisser did not testify that Joughin's front tooth was broken due to the insertion of the dog toy. But Dr. Beisser did state to a reasonable degree of scientific certainty that Joughin's tooth could have broken when the dog toy was inserted. In his closing argument, the prosecutor addressed the element of purpose as follows:

> From the moment he took her on County Road 6, he was going to have to kill her if he was going to get away with it. He could not let her go and avoid punishment. But there's more. You heard Major Smithmyer talk about some of the videos that he watched. There's a movie called "Death of a Tennis Star" where the female character is choked on a tennis net, choked out on a tennis net.
>
> [Worley] was into that kind of pornography. And he wanted to watch [Joughin] die. He wanted to watch her die. That's why he didn't use the ball gag that's specifically designed for bondage activity. That's why he used a dog toy that's tied in place.
>
> And you heard Dr. Beisser say it took minutes for [Joughin] to die, visible signs of distress, up to ten minutes. But [Worley] wanted to watch that because that's what got him excited.
>
> And that dog chew—right, you see the dog chew and the rope that was inserted into [Joughin's] mouth, you can see how it was run through the dog toy and inserted into [Joughin's] mouth to prepare for this type of activity, and *how it was inserted with such force that it broke her tooth*. It requires that much force, yet he still ties it in place.
>
> So [Joughin] is killed by the insertion of that yellow dog chew because she still cannot breathe.

(Emphasis added.)  Later, the prosecutor argued:

> The tying of that dog chew in place shows her death is purposeful.  Her death was purposely caused.  Again, same thing, more evidence of purpose, the videos he watched were of the female character being strangled to death as part of the video.

{¶ 112} Worley cannot establish that defense counsel's failure to object to the prosecutor's trial-phase closing argument was constitutionally deficient.  The prosecutor's remarks were based on a reasonable inference from Dr. Beisser's testimony.  Dr. Beisser testified that the dog toy was the same size as Joughin's mouth and that it had been inserted far enough to fill her entire oral cavity, and yet, it was also firmly tied in place.  She also testified that as Joughin asphyxiated, there would have been visible or audible signs of distress as Joughin struggled to breathe and that she ultimately died within ten minutes.  When asked, Dr. Beisser testified that the dog toy could have been inserted into Joughin's mouth forcefully enough to have broken her front tooth.  The prosecutor's argument represented a reasonable inference from Dr. Beisser's testimony.

{¶ 113} Worley has not shown that defense counsel performed deficiently by failing to object during the prosecutor's closing argument.  Accordingly, we reject Worley's third proposition of law.

### D.  Admission of evidence of other crimes, wrongs, or acts

{¶ 114} In his fifth proposition of law, Worley challenges the state's introduction of evidence of Worley's abduction of Robin Gardner in 1990.[4]  He claims that the evidence was inadmissible under Evid.R. 404 and 403.

_____

4.  The jury was not told that the incident about which Gardner testified resulted in Worley's conviction for abduction.  Because Worley's conviction for abduction was relevant to the having-a-

{¶ 115} Before trial, the state gave notice that it intended to call Gardner as a witness. Worley filed a pretrial motion in limine arguing that Gardner's testimony was inadmissible character evidence. The court denied Worley's motion.

{¶ 116} The state called Gardner as its final witness in the trial phase, and defense counsel renewed their objection. Before Gardner testified, the trial court instructed the jury regarding the limited purposes for which it could consider her testimony.

{¶ 117} The admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that we review de novo. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. But the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant pursuant to Evid.R. 403(A) involves an exercise of judgment and will be reviewed for an abuse of discretion. *Hartman* at ¶ 30.

### 1. Evid.R. 404(B)

{¶ 118} Evidence of other acts may not be used to prove by inference that the accused acted in conformity with those other acts or that he has a propensity to act in that way. Evid.R. 404(B). Other-acts evidence may be admissible for nonpropensity purposes—i.e., as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* To justify the admission of other-acts evidence for a nonpropensity purpose, the evidence must pertain to a " 'material' issue that is actually in dispute." *Hartman* at ¶ 27, quoting *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). Worley disputed that he was the perpetrator in this case, so his identity was squarely at issue.

{¶ 119} The state asserts that Gardner's testimony demonstrated Worley's particular modus operandi and thus his identity as Joughin's murderer. It is well

---

weapon-under-a-disability count in the indictment, the parties stipulated that the court would instruct the jury that Worley had been convicted of a felony offense of violence.

established that other-acts evidence may be admitted to establish modus operandi. *State v. Lowe*, 69 Ohio St.3d 527, 530, 634 N.E.2d 616 (1994). Modus operandi evidence is evidence of "signature, fingerprint-like characteristics unique enough 'to show that the crimes were committed by the same person.' " *Hartman* at ¶ 37, quoting Weissenberger, *Federal Evidence*, Section 404.17 (7th Ed.2019). Slight differences between the current and other acts will not affect the admissibility of the other-acts evidence as long as it establishes "a *modus operandi* identifiable with the defendant." (Emphasis sic.) *Lowe* at 531.

{¶ 120} The evidence of Worley's abduction of Gardner established a modus operandi tending to prove Worley's identity as the person who kidnapped and killed Joughin. In both cases, Worley assaulted a young woman (Gardner was 26 and Joughin was 20) who was riding a bicycle in a rural area surrounded by cornfields. Worley attacked each woman by hitting her on the back of the head, causing each of them to sustain a skull fracture. In the course of committing both crimes, Worley used a distinctive kind of handcuff on his victims that could not be removed with any keys that had been available to law enforcement. And Worley used a pickup truck in both cases with the apparent intent of using the truck to transport each of the victims back to his property.

{¶ 121} The most powerful evidence of a modus operandi, however, was Worley's use of a screwdriver during the abductions. Worley argues that although a screwdriver was found in both cases, the screwdriver in this case was not located near the abduction site and that DNA testing of the handle failed to yield a result. But Worley is incorrect that the screwdriver in this case was not near the abduction site. His screwdriver was found in the western cornfield on County Road 6 in an area where agents found broken cornstalks and blood stains on leaves. And more importantly, at bottom, this argument is a challenge to the weight and credibility of the evidence, which is not relevant in deciding whether the evidence was admissible. "Admissibility is not adversely affected simply because the other

[crimes] differed in some details. * * * The weight to be given to this evidence is for the jury to determine." *State v. Jamison*, 49 Ohio St.3d 182, 187, 552 N.E.2d 180 (1990).

{¶ 122} Worley further contends that Gardner's testimony failed to "provide the jurors with information about the purposefulness of the killing of Joughin with the [dog] toy." But this argument misses the point—Gardner's testimony was not introduced to provide the jury with information about the purposefulness of Joughin's murder. The facts surrounding Gardner's abduction establish "a similar method of operation" to that in this case, making the other-acts evidence probative of identity. *State v. Bey*, 85 Ohio St.3d 487, 491, 709 N.E.2d 484 (1999).

{¶ 123} The similarities between Worley's abduction of Gardner and the evidence of his kidnapping and assault of Joughin are striking. Indeed, the trial court correctly determined that Gardner's testimony was offered for a proper purpose—i.e., to prove the identity of Joughin's killer.

### 2. Evidence Rule 403(A)

{¶ 124} Worley argues that even if Gardner's testimony was admissible under Evid.R. 404(B), it was inadmissible under Evid.R. 403(A), which requires a trial court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice."

{¶ 125} The exclusion of relevant evidence under Evid.R. 403(A) requires more than mere prejudice, because anything adverse to a party's case could be deemed prejudicial to that party. *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23 (Evid.R. 403(A) requires exclusion only of "evidence that is *unfairly* prejudicial" [emphasis sic]). We have held:

"Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence

42

arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect."

*Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting Weissenberger, *Ohio Evidence*, Section 403.3, at 85-87 (2000).

{¶ 126} Given the considerable similarity between the two incidents, the probative value of Gardner's testimony was high. Worley has not shown that the testimony *unfairly* prejudiced him or appealed to the jury's emotions. The evidence was directly probative of a material issue in dispute—namely, the assailant's identity. *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 31. Although the state referred to Gardner's testimony during closing argument, the reference was not prolonged—in an argument that covers 59 transcript pages, the Gardner incident occupies less than two.

{¶ 127} We hold that the trial court did not abuse its discretion by allowing Gardner's testimony and find no merit in Worley's fifth proposition of law.

*E. Sentencing opinion*

**1. Reliance on facts not in evidence**

{¶ 128} Worley argues in his ninth proposition of law that the trial court's sentencing opinion inappropriately relied on facts not in evidence "to find beyond a reasonable doubt that the aggravating factor in a capital prosecution outweighed the mitigating circumstances in order to sentence a defendant to death." In particular, Worley points to the trial court's finding that "[t]he gag was placed with enough force to break Ms. Joughin's tooth." Worley reasons that because "[t]he jurors did not formally state the facts they relied on to conclude that Worley acted purposely," the trial court's reliance on that particular fact was erroneous.

{¶ 129} R.C. 2929.03(F) sets forth the findings a trial court must make when imposing a death sentence. The statute requires that the court state:

[S]pecific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

{¶ 130} In the sentencing opinion, the trial court recited the underlying facts in the case before setting out the mitigating factors and engaging in the analysis of why the aggravating circumstances sufficiently outweighed the mitigating factors. The basis of Worley's argument is that there was no evidence to support the trial court's statement that he inserted the dog toy into Joughin's mouth with enough force to break her tooth. Although the coroner did not testify that the forceful insertion of the dog toy did, in fact, break Joughin's tooth, she did testify to a reasonable degree of scientific certainty that "that foreign body could have broken her tooth." Photographic and video evidence showed that Joughin's front teeth were fully intact prior to the abduction. The coroner's testimony, along with the other evidence, was sufficient for the trial court to infer that Worley broke Joughin's tooth by forcefully shoving the dog toy in her mouth. *See State v. Simko*, 71 Ohio St.3d 483, 494, 644 N.E.2d 345 (1994) (the trial court did not misstate the evidence in its sentencing opinion by referring to a reasonable inference based on the evidence presented at trial).

{¶ 131} Accordingly, we reject Worley's ninth proposition of law.

## 2. Failure to give proper weight to mitigating facts

{¶ 132} In his tenth proposition of law, Worley argues that in the sentencing opinion, the trial court violated the Eighth and Fourteenth Amendments to the United States Constitution when it gave "no or minimal weight to, or unreasonably discount[ed], accepted mitigation evidence." Worley claims that the court gave "little weight" to his (1) history, character, and background, (2) history of concussions, and (3) cannabis-use disorder. He also argues that the trial court violated the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution when it "avoided giving any weight to nine of Worley's twelve mental illness diagnoses."

{¶ 133} The court considered the evidence submitted by Dr. John Fabian, a forensic and clinical psychologist, that Worley seemed to have genuinely cared for his family and, as diagnosed by Dr. Fabian, that he suffered from mental illnesses and personality disorders. Accordingly, the court assigned "some weight due to the cumulative nature of these mitigating factors." Although the court failed to address Worley's adaptability to prison, Dr. Fabian's report discusses that factor. And the trial court mentioned the remaining mitigating evidence that had been presented by Dr. Fabian. Worley's argument rests on his assertion that the trial court "unreasonably discounted" his mitigating evidence.

{¶ 134} Quoting *Porter v. McCollum*, 558 U.S. 30, 42, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009), Worley argues that the case "is instructive here" because the United States Supreme Court "held [in that case] that the Florida Supreme Court 'either did not consider or unreasonably discounted the mitigation evidence' adduced in a state postconviction hearing." He is incorrect. We have previously rejected this argument, observing that "[t]he *Porter* court was not directly reviewing a trial court's weighing of aggravation against mitigation in the penalty phase; it was reviewing a state court's analysis of an ineffective-assistance claim on collateral review." *State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9

N.E.3d 1031, ¶ 65. Finding this procedural difference to be dispositive, we held that "*Porter* does not stand for the proposition that the Eighth Amendment forbids a sentence to 'discount' mitigating evidence introduced at the penalty phase of the trial." *Id.*

{¶ 135} Moreover, the record does not support Worley's claim that the trial court erred in how it assigned weight to his mitigating evidence or in weighing the mitigating factors. It is true that despite the fact that Dr. Fabian's report contained a section detailing Worley's institutional adjustment, the trial court's opinion did not mention Worley's ability to adapt to prison life. The history in Dr. Fabian's report reveals that Worley generally adjusted well to prison life, in that he completed educational programs and while he was incarcerated for this case, he received only one ticket for yelling at another inmate.

{¶ 136} But a trial court is not required to individually discuss each mitigating factor in its sentencing opinion. *See State v. Phillips*, 74 Ohio St.3d 72, 104, 656 N.E.2d 643 (1995). Moreover, any error in assigning weight to any of the mitigating factors may be cured during our independent analysis of Worley's death sentence. *See State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 143; *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 155.

{¶ 137} Accordingly, we reject Worley's tenth proposition of law.

### F. Settled issues

#### 1. *Hurst v. Florida* challenge

{¶ 138} In his sixth proposition of law, Worley argues that Ohio's death-penalty statutes violate the Sixth Amendment right to a jury trial as construed in *Hurst v. Florida*, 577 U.S. 92, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). We overrule this proposition of law on the authority of *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56.

### 2. Other constitutional and international-law challenges

{¶ 139} In his seventh proposition of law, Worley presents several frequently raised constitutional challenges to Ohio's capital-punishment scheme. In his eighth proposition of law, he argues that Ohio's death-penalty statutes violate international law "whether found in treaty or in custom." Because we have considered and rejected each of these claims previously, we summarily reject them now. *See, e.g.*, *Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 279-280; *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 184; *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 111, 113-115, 124; *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 239-240; *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 87, 88; *State v. Jenkins*, 15 Ohio St.3d 164, 167-168, 178-179, 473 N.E.2d 264 (1984); *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 211.

### 3. Proportionality

{¶ 140} In the last section of his seventh proposition of law, Worley contends that our R.C. 2929.05(A) method of proportionality review is constitutionally infirm. He argues that the "comparison method" of review, upheld in *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), "prevents a fair proportionality review" because there is "no meaningful manner to distinguish capital defendants who deserve the death penalty from those who do not." He argues that R.C. 2929.021—which requires clerks of trial courts to notify this court of all capitally charged cases regardless of the sentencing outcome—creates "substantial doubts as to the adequacy of the information received after guilty pleas to lesser offenses or after charge reductions at trial."

{¶ 141} Because Ohio has determined that death should be an available penalty for certain crimes, it must administer that penalty in a way that rationally distinguishes individuals for whom death is an appropriate sanction from those for

whom it is not. *Zant v. Stephens*, 462 U.S. 862, 873-880, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Furman v. Georgia*, 408 U.S. 238, 294, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring). In every death-penalty direct appeal, we are statutorily required to "consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). The statute continues by requiring us to "affirm a sentence of death only if [we are] persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case." *Id.*

{¶ 142} That language means that in every capital direct appeal, before deciding whether a death sentence will stand, we must consider the record to determine whether the death sentence was correctly imposed (meaning that "the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case") and to ensure that the death sentence is appropriate. *See* R.C. 2929.05(A). We have determined, with respect to the appropriateness inquiry, that the phrase "similar cases" as used in R.C. 2929.05(A) includes "those cases already decided by the reviewing court in which the death penalty has been imposed." *Steffen* at paragraph one of the syllabus; *but see Jenkins*, 15 Ohio St.3d at 209, 473 N.E.2d 264 ("R.C. 2929.05 does not require a comparison of sentences in non-capital murder cases for proportionality review").[5]

## G. Cumulative error

{¶ 143} In his eleventh proposition of law, Worley argues that cumulative errors committed during his capital trial necessitate a reversal of his convictions

---

5. The author of this opinion, speaking only for himself and not for this court, has previously expressed the view that our proportionality review should include factually comparable cases that did not result in the death penalty. *See State v. Graham*, __ Ohio St.3d __, 2020-Ohio-6700, __ N.E.3d __, ¶ 220-229 (Donnelly, J., concurring). The author of this opinion nevertheless agrees that the heinous facts of this case would not make the sentence imposed here disproportionate even if this court were to undertake such a review.

and death sentence. We have not identified a single error in Worley's trial, so the cumulative-error doctrine does not apply. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. As such, we reject the eleventh proposition of law.

## IV. INDEPENDENT-SENTENCE EVALUATION

{¶ 144} We have a duty to independently review the death sentence for appropriateness and proportionality. R.C. 2929.05(A). In conducting this review, we must determine whether the evidence supports the jury's finding of the aggravating circumstance, whether that aggravating circumstance outweighs the mitigating factors, and whether Worley's death sentence is proportionate to those affirmed in similar cases. *Id.* We consider these issues de novo. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 272.

### A. *Aggravating circumstance*

{¶ 145} The only aggravating circumstance that the jury considered was that Worley committed aggravated murder "for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed" by Worley— namely, kidnapping. *See* R.C. 2929.04(A)(3). As we discussed in connection with proposition of law No. I, the evidence presented at trial supported the jury's finding that Worley was guilty of purposely killing Joughin in order to escape detection for kidnapping her. Accordingly, the evidence supports the capital specification that was found by the jury under R.C. 2929.04(A)(3).

### B. *Mitigating factors*

{¶ 146} We must weigh the above aggravating circumstance against any mitigating evidence about "the nature and circumstances of the offense" and Worley's "history, character, and background." R.C. 2929.04(B). In addition, we must consider and weigh any evidence of the mitigating factors specifically listed in R.C. 2929.04(B):

(1)  Whether the victim of the offense induced or facilitated it;

(2)  Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3)  Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

(4)  The youth of the offender;

(5)  The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6)  If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

### 1.  Worley's mitigation evidence

{¶ 147} At Worley's mitigation hearing, his counsel presented testimony from three lay witnesses who were friends or acquaintances of Worley (Thomas Mossing, Jack Roschmann, and William Gombash).  The defense also presented testimony from a mitigation investigator (Gary Ericson) and a forensic and clinical psychologist (Dr. Fabian).  Worley declined to make an unsworn statement.

#### *a.  Family history, childhood, and educational background*

{¶ 148} The evidence presented demonstrated that Worley's childhood was difficult because his parental figures exposed him to physical abuse and alcoholism.

Because no members of Worley's family testified, his familial and childhood history was presented through the testimony of Ericson and Dr. Fabian.

{¶ 149} Ericson interviewed Worley's sister (Cynthia Barlow), a friend of Worley's (Thomas Wilson), a former friend (Lorna Mangrum), and a former employer (Mr. Newlan). He also interviewed Worley on several occasions. Defense counsel played for the jury a recording of Barlow's interview in full. The recording was also admitted into evidence. Defense counsel chose not to offer Ericson's written report into evidence because it contained information regarding other interviews that defense counsel did not want to present to the jury.

{¶ 150} Worley's parents (James Sr. and Florence) were married in 1941, and they later had three children: Cynthia, James, and Mark. Worley was born in 1959 in the state of Washington, approximately four years after his sister and two years before his brother. The family later moved to Waukegan, Illinois, and then to Ohio, where the family ultimately settled in Fulton County. According to Worley, he lived at the same property in Fulton County from third grade until the day of his arrest for Joughin's murder. His brother, Mark, also lived on the Fulton County property, but in a separate trailer near the residence.

{¶ 151} Both Worley and his sister recalled that their father drank after work with his colleagues and, on returning home, James Sr. would become violent toward their mother. Worley remembered one particular fight, during which his mother tried to pick up the telephone, but his father yanked the cord out of the wall. Barlow recalled the same episode, but added that she recalled her father having a butcher knife in his hand while he chased her mother, and that Barlow attempted to help her mother escape through a bedroom window.

{¶ 152} When Worley was around five years old, his mother was granted a divorce based on James Sr.'s "gross neglect of duty and extreme cruelty." Worley and his siblings remained with their mother after the divorce. The children "didn't

see [their father] for a long time," but eventually began to see him "every six months for seven hours." Worley said that those visits "went on for a number of years."

{¶ 153} Around 1969, Worley's mother married Graydon "Jack" Shepherd. According to Ericson, Worley respected his stepfather. Ericson said that Worley did not make any "denigrating statements that [he could] ever recall" about Shepherd. Barlow told Ericson that Shepherd had been a drill sergeant in World War II and that he had a gruff demeanor. According to Dr. Fabian, Worley previously told a presentence investigator that around the age of 16 or 17, he and his brother had moved in with their biological father "because of a strict upbringing with their step-father and mother, and [because] they were searching for some freedom."

{¶ 154} Barlow said that unlike James Sr., Shepherd did not have a penchant for physical violence toward their mother but, like James Sr., Shepherd drank heavily. Dr. Fabian reported that Barlow told him that when she was about 16 years old, Shepherd began trying to have sex with her. She stated to Dr. Fabian: "He grabbed me and threw me down and tried to rape me." Barlow informed Dr. Fabian that on two occasions, Worley walked in on Shepherd raping her, but that she and Worley never discussed it.

{¶ 155} According to Barlow, Worley never disrespected her or their mother. In fact, Barlow stated that their mother spoke highly of Worley and how well he cared for her in her later years. Worley informed Dr. Fabian that he had had a "[v]ery strong" emotional connection with his mother and that she never excessively disciplined him or his siblings. According to Worley, his mother was "a genuinely awesome person." Worley described his emotional connection to James Sr. as "[g]ood, even though [he] had a hard time processing what [he] saw when [he] was little or when [he] was five years old." But as he aged, Worley began to view James Sr. as a "pretty good guy," because in Worley's view, "[o]ne bad day shouldn't define someone."

{¶ 156} Barlow recalled that Worley struggled in school and that he may have been prescribed Ritalin when he was less than ten years old. She recalled that when they were young, Worley was very social and liked to talk to people and play pranks. According to Barlow, Worley had to repeat the third grade because he was inattentive during class. Dr. Fabian reviewed Worley's educational records and testified that Worley was an underachiever who had a 1.5 grade-point average upon graduating from high school. Records show that Worley's IQ early in life was determined to be around 97, which, according to Dr. Fabian, is "right at the 50th percentile." In his report, Dr. Fabian noted that Worley briefly attended Owens Community College in Toledo, but that he voluntarily withdrew in 2000 and lacked sufficient credits to complete a degree. His final grade-point average at Owens Community College was 2.0.

### b. Psychologist testimony

{¶ 157} Dr. Fabian met with Worley twice, interviewed Barlow, reviewed a host of information regarding Worley's life, and administered various psychological tests. Dr. Fabian testified that three factors impeded his assessment: (1) Worley's lack of openness about his childhood and prior offense history, (2) Worley's denial of his role in and responsibility for the prior offense and the instant offense, and (3) Worley's mental-health issues, including severe personality disorders, which likely exacerbated the first two factors.

{¶ 158} Noting the episodes of physical and sexual violence that Worley reportedly had witnessed as a child, Dr. Fabian concluded that Worley "lack[ed] an emotional depth and insight into his relationships with his parents." Dr. Fabian stated that he had "concerns about a potentially incestuous relationship with [Worley and his] mother." Dr. Fabian acknowledged, however, that there was no evidence to support this conjecture.

{¶ 159} Dr. Fabian opined that Worley "ha[d] a chronic cannabis-dependence problem" exhibited by his "long history of cannabis use beginning

around age 10 or 12 or 13." Dr. Fabian concluded that Worley "lack[ed] * * * insight or self-awareness or self-introspection" in terms of how his drug use negatively affected his life.

{¶ 160} Because Ericson could not locate any mental-health records, Dr. Fabian used a presentence evaluation for purposes of reviewing Worley's mental-health history that had been done in connection with Worley's 1990 abduction case. Those records indicated that Worley reported "some memory of trauma in his life, especially relating to Father to Mother, had used cannabis, some experimentation, not as regular, use of cocaine." Dr. Fabian agreed with the assessment by the presentence-evaluation psychologist that Worley had "a personality disorder with narcissistic, antisocial, and inadequate features."

{¶ 161} Dr. Fabian reviewed Worley's records for a history of any head injuries to inform his neuropsychological assessment. A medical record indicated that in 1994, Worley suffered a scalp laceration and a head contusion. Worley told Dr. Fabian that in 1982, he was in a car accident and that he "went through the windshield." Worley said, however, that he did not lose consciousness, and no medical records were found relating to that incident. Ultimately, Dr. Fabian stated, "[I]t's likely he had a couple of concussions, you know, as an adult."

{¶ 162} Dr. Fabian also administered a battery of tests, including the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and the Millon Clinical Multiaxial Inventory-III ("MCMI-III"). The MMPI-2 assesses for psychopathology, personality, and emotional functioning. According to Dr. Fabian, Worley was shown to be "irritable, suspicious, very guarded, * * * [and] paranoid," and he showed "antisocial behaviors, * * * a disconnect with people [and] * * * feelings of inadequacy, low self-esteem, [and] depressi[on.]" Dr. Fabian also testified that Worley exaggerates his abilities and feels a sense of entitlement. Worley's performance on the MCMI-III demonstrated that he is "meticulous, perfectionistic, [and has] rigid moral beliefs. * * * But underneath

that veneer, there's some dark sides to him." Dr. Fabian also said that Worley was likely experiencing mild chronic depressive disorder at the time of the offense.

{¶ 163} Dr. Fabian reported that it was "very difficult to evaluate Mr. Worley due to his denial of not only his criminal offense history but also his psychiatric symptoms. He also lacked the depth as to his emotional functioning and interconnectedness with other people." Dr. Fabian diagnosed Worley with "sexual sadism disorder; fetishistic disorder; other specified personality disorder with paranoid, antisocial, narcissistic and obsessive-compulsive traits; a persist[ent] depressive disorder; cannabis use disorder; attention deficit hyperactivity disorder [("ADHD")], combined type, [which would] would be inattention and impulsivity combination." Dr. Fabian also diagnosed Worley with a "Possible Mild Neurocognitive Disorder Due to Concussive History."

{¶ 164} Dr. Fabian testified that he viewed the applicable mitigating factors as "some dysfunction in childhood," evidence of ADHD, depression, cannabis dependence, inadequate coping skills, isolation, and low self-esteem. Dr. Fabian opined that Worley's "emotional loneliness" fueled "a dark fantasy life that he had relevant to sadistic sexual acts and then in connection with a fetishistic disorder." Dr. Fabian summed up his thoughts as to the applicable mitigating factors as follows:

I've got a defendant here that won't open up to me when it really counts, and had never really seen a therapist or opened up[,] and living in, I guess, this warped world taking care of his mother, who was the only female in his life, where he was quite detached, and I think looking at pornography with a friend of his, which is what maybe 17-year-olds do or 14-year-olds, but maybe not 55-year-olds.

{¶ 165} On cross-examination, Dr. Fabian admitted that Worley's chronic depression was not so severe that it would lead to "difficulties in life function."

### c.  Work history

{¶ 166} Worley held numerous jobs for short periods of time throughout his adult life, and he had attempted to start multiple businesses, none of which were successful.  Dr. Fabian testified that Worley showed "motivation, but then there's a lot of failure.  * * * So there are periods of unemployment and then also eventual caretaking of his mother full time."

### d.  Worley's relationships

{¶ 167} Barlow indicated to Ericson and Dr. Fabian that Worley "liked to talk and goof around" and that "he had some friends outside of the family."  The defense called three of Worley's "friends" as mitigation witnesses.  Each of them had been interviewed by the FBI and gave those investigators different descriptions of Worley.  Mossing described Worley as talkative but peculiar.  Roschmann described Worley as "weird" and as having "a crazy side when they hung out back in the day."  At trial, Roschmann further stated that Worley was "[w]ild, maybe aggressive."  And Gombash described Worley as "severely unstable."

{¶ 168} There was ample evidence that Worley voluntarily took on the responsibility to care for his mother on a permanent basis.  He expressed to both Dr. Fabian and Ericson that he loved his mother and felt lucky that she was his mother.

### e.  Criminal history

{¶ 169} Worley had previously been convicted of multiple felonies, including the 1990 abduction of Robin Gardner, and in 2000, he was convicted of illegally manufacturing drugs and possessing weapons while under a disability.  He served time in prison for both of the latter convictions.

### *f. Ability to adjust to incarceration*

{¶ 170} Dr. Fabian addressed in his report Worley's adjustment to incarceration. With respect to his 1990 abduction conviction, the Department of Rehabilitation and Correction's records indicated that Worley had adjusted well to prison, that he completed various programs, and that he treated staff and fellow inmates well. While in prison for his drug-manufacturing conviction, Worley worked as a "career technical school aid tutor, porter, and a student and food services worker."

{¶ 171} At the time of the mitigation hearing, Worley had been incarcerated at the Corrections Center of Northwest Ohio for about 15 months. Dr. Fabian's report indicates that jail records showed one infraction that resulted in him being placed in lock-down.

## 2. Sentence evaluation

{¶ 172} At the close of the mitigation phase, defense counsel asked the jury to consider various mitigating factors, including Worley's history, character, and background. Notably, however, defense counsel did not ask the jury to consider Dr. Fabian's finding that Worley had adjusted well to prison life. Further, Worley does not argue that any additional statutory mitigating factors apply. And the record does not provide evidence of other mitigating factors.

{¶ 173} Nothing in the nature or the circumstances of this offense is mitigating. Joughin was attacked while riding her bike in a rural area less than one mile from her home. She was hit on the head, handcuffed, and taken to Worley's property where he undressed her, placed her in risqué lingerie, bound her hands to her ankles, and suffocated her with a rubber dog toy. He then buried her in a shallow grave in a cornfield.

{¶ 174} Worley presented some evidence of his difficult childhood and family background. Worley's father was an alcoholic and had abused Worley's mother in front of him. Worley and his sister both recalled an incident when their

drunken father chased their mother around the house and that their father yanked the telephone cord out of the wall when their mother tried to call the police. Worley's parents divorced when he was four or five years old. Worley's biological father all but vanished immediately after the divorce, and it was several years before Worley even heard from James Sr.

{¶ 175} Worley's stepfather also drank heavily. Barlow told Dr. Fabian that Shepherd started trying "to have sex with her with she was about 16," and that she "experienced penetration which would meet the definition of rape." She also told Dr. Fabian that Worley, who would have been approximately 12 years old, walked in on her stepfather raping her "[b]oth of those times." The evidence of Worley's childhood indicates that he was traumatized at an early age. According to Dr. Fabian, this led to Worley being emotionally regressed, lacking appropriate interpersonal relationships, and having no impulse control.

{¶ 176} We have not always given strong weight to a defendant's unstable or troubled childhood even in cases in which such occurrences were extremely severe. *See*, *e.g.*, *State v. Campbell*, 95 Ohio St.3d 48, 51-53, 765 N.E.2d 334 (2002) (an independent review of the evidence, which included Campbell's family history indicating that he was one of six children in an unruly household in which both parents abused alcohol; that Campbell's father forced the children to watch while he beat their mother, locked their mother outside in cold weather, and threatened to kill the children if they let her back in the house; and that Campbell was beaten, isolated, terrorized, and encouraged to commit crimes at a young age, still led to a decision by this court that the aggravating circumstances outweighed, beyond a reasonable doubt, the mitigating factors that were present in the case); *but see State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 101-106 (an independent review of the evidence, which included testimony that the defendant's parents were "abusive, neglectful, and pernicious influences on their children, who were schooled in crime from an early age" and other physical abuse,

led to this court's finding that the "aggravating factor [did] not outweigh the mitigating factors in evidence to support a sentence of death"); *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 137-140 (this court vacated the defendant's sentence of death because "the mitigation evidence militate[d] against imposing the death sentence"). On the other hand, ample evidence was presented showing that Worley cared for his mother as she aged, cared for his mentally ill brother, and felt a deep sense of love for them. Thus, his childhood and familial relationships are entitled to some weight.

{¶ 177} Despite Worley's demonstrated lack of candor in the evaluation, Dr. Fabian concluded that Worley likely did have a history of mental-health problems. In connection with the 1990 abduction, Worley was diagnosed with a personality disorder with narcissistic, antisocial, and inadequate features. Dr. Fabian concurred with that diagnosis and made additional diagnoses, some of which were severe: "The paraphiliac connection between sexual sadism and fetishistic disorder also is aggravated with the personality pathology of Mr. Worley, including evidence of antisocial, narcissistic, obsessive-compulsive, and paranoid personalities." Furthermore, Worley struggled with intimacy issues. As reported by Dr. Fabian: "In my opinion, Mr. Worley was emotionally detached from society, lacked the ability and confidence to make good friends, had severe feelings and perceptions of self-inadequacy and then he would retreat into his own internal world due to fear of rejection." We have previously accorded significant weight to "personality disorders and other mental problems under the catch-all provision, R.C. 2929.04(B)(7)." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 300 (after evaluations by three psychologist experts, evidence that the defendant was paranoid and suffered from other personality disorders and "made bizarre comments that made little sense and exhibited other odd behavior during trial" was given significant weight). Worley's personality disorders were not strongly substantiated and we therefore give them only some weight.

{¶ 178} Worley was also diagnosed with cannabis disorder, which Dr. Fabian testified affected Worley's self-reflection and insight into how his drug use affected his life. Worley's IQ of 97 falls within the average range, but he did not excel in school. The evidence also demonstrated that Worley had untreated and likely lifelong mental-health issues, and that some family members have suffered from mental-health issues. Thus, we give Worley's mental-health disorders some weight under R.C. 2929.04(B)(7). *See State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 296.

{¶ 179} Although the issue was not explored at trial, Dr. Fabian addressed Worley's adaptability to incarceration in his report. Generally speaking, the evidence of his prior incarcerations and the 15 months or so that he spent in jail for the instant offenses show that, with very minimal infractions, he was a productive inmate and treated other inmates and staff with respect. Therefore, we give his good behavior while incarcerated some weight.

{¶ 180} Dr. Fabian testified that Worley denied "not only his criminal offense history but also his psychiatric symptoms," thus making him difficult to evaluate. Dr. Fabian gave Worley multiple mental-health diagnoses, some of which were severe, and found that his childhood was chaotic and difficult, but there was no evidence that these factors deprived Worley of the "substantial capacity to appreciate the criminality of his conduct." *See* R.C. 2929.04(B)(3). Worley's denial that he committed the offenses against Joughin resulted in his failing to show any remorse. Moreover, this was not a crime of impulse; Worley spent significant time (prior to and including the day of the offense) watching pornographic videos showing young women being bound and strangled. We hold that Worley's resolve to murder Joughin to escape detection for kidnapping her far outweighs the mitigating factors beyond a reasonable doubt.

### 3. Proportionality

{¶ 181} When this case is compared to cases involving similar crimes, the imposition of the death penalty is appropriate and proportionate for the murder of Joughin, which Worley committed in order to escape detection, apprehension, trial, or punishment for kidnapping her. R.C. 2929.05; *see, e.g.*, *State v. Lawson*, 64 Ohio St.3d 336, 353, 595 N.E.2d 902 (1992) (this court affirmed the defendant's death sentence for the crimes of murder during a kidnapping and murder to escape detection); *State v. Stumpf*, 32 Ohio St.3d 95, 108, 512 N.E.2d 598 (1987) (this court affirmed the defendant's death sentence for the crime of murder to escape detection).

## V. CONCLUSION

{¶ 182} For the foregoing reasons, we affirm Worley's convictions and death sentence.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, FISCHER, DEWINE, STEWART, and BRUNNER, JJ., concur.

_____

Scott A. Haselman, Fulton County Prosecuting Attorney, for appellee.
Gary W. Crim and Andrew P. Avellano, for appellant.

_____