[Cite as *State v. Wolfe*, 2024-Ohio-701.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2023-P-0017 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| NEIL S. WOLFE, | |
| Defendant-Appellant. | Trial Court No. 2022 CR 00361 |

### O P I N I O N

Decided: February 26, 2024
Judgment: Affirmed

*Victor V. Vigluicci*, Portage County Prosecutor, and *Kristina K. Reilly*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Paul M. Grant*, 209 South Main Street, Eighth Floor, Suite 3, Akron, OH 44308 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1}    Appellant, Neil S. Wolfe ("Mr. Wolfe"), appeals the judgment entry of the Portage County Court of Common Pleas that sentenced him to a 36-month term of imprisonment and ordered him to pay $150,000 in restitution. A jury found Mr. Wolfe guilty of grand theft for taking $150,000 from a homeowner while acting as a building contractor.

{¶2}    Mr. Wolfe raises two assignments of error, contending (1) the trial court erred as a matter of law by allowing the state to admit other acts evidence, and (2) his conviction is against the manifest weight of the evidence.

{¶3} After a careful review of the record and pertinent law, we find Mr. Wolfe's assignments of error to be without merit.

{¶4} Firstly, the state's other acts evidence was admissible to prove intent/absence of mistake, a material issue at trial. The evidence offered demonstrated Mr. Wolfe defrauded other customers the same way and with a similar intent, contrary to Mr. Wolfe's assertion that the instant case is a mere contractual dispute over conditions precedent to him performing any work while keeping the client's deposit. Further, the probative value of this evidence was high, and Mr. Wolfe did not demonstrate that the evidence unfairly prejudiced him or appealed to the jury's emotions.

{¶5} Secondly, the manifest weight of the evidence supports the jury's verdict. Simply because the jury chose to believe the state's version of theft over Mr. Wolfe's version of a contract dispute does not mean the jury so lost its way that a manifest injustice occurred and that a new trial must be ordered.

{¶6} The judgment of the Portage County Court of Common Pleas is affirmed.

**Substantive and Procedural Facts**

{¶7} In late March 2022, Mr. Wolfe was indicted by the Portage County Grand Jury, charging him with one count of grand theft, a third-degree felony, in violation of R.C. 2913.02.

{¶8} In January 2023, the state filed a motion to revoke Mr. Wolfe's bond because he continued acting as a contractor in violation of a court order in a pending case in the Cuyahoga County Court of Common Pleas. Mr. Wolfe filed a brief in opposition, contending he was acting as a project manager under the direction and control of Wheeler Construction & Renovation pursuant to the court's order. After a hearing, the trial court

2

granted the state's motion, revoked Mr. Wolfe's bond, and ordered that he be held without bond until the scheduled trial date, January 31, 2023.

### The State's Case in Chief

{¶9} The state presented to the jury the testimony of the victims, Deborah and Fred McLaughlin (respectively, "Mrs. and Mr. McLaughlin," collectively, the "McLaughlins"); Mr. McLaughlin's son, Justin McLaughlin ("Justin"); Detective Michael Hanna ("Det. Hanna") of the Portage County Sheriff's Office; and Monica Gregory ("Ms. Gregory"), an investigator from the Ohio Attorney General's Office (the "AG").

{¶10} The state's testimony and evidence revealed that the McLaughlins own a farm in Portage County, where they raise cattle, pigs, and goats and breed dogs. In 2020, after struggling to care for Mrs. McLaughlin's parents, who lived in an adjacent county, and Mr. McLaughlin's mother, who lived with them, they decided to build a separate structure on their property for another residence. The proposed building was approximately 11,000 square feet and included a therapeutic dog kennel and more storage room for their equipment.

{¶11} Mr. McLaughlin put his plans and a description of the project on a website to solicit bids.

{¶12} Mr. Wolfe was one of the contractors who responded. After several dinners going over Mr. McLaughlin's drawings and the specifications for the project, Mr. Wolfe put in a bid of $350,000. The amount of the bid was for the concrete work, the block work, and the shell of the structure, including the roof and the siding. Mr. McLaughlin, who owned his own heavy equipment, planned to do the initial excavation and draining prior to Mr. Wolfe pouring the concrete foundation.

3

{¶13} Mr. Wolfe prepared a contract that he presented to Mr. McLaughlin at their second-to-last dinner. Mr. McLaughlin, however, disagreed with several of the clauses. He wanted to make sure he could get a full refund if one of the parties breached the contract. Mr. Wolfe agreed and removed the clauses. Mr. Wolfe and Mr. McLaughlin had their last dinner the following night, at which Mr. McLaughlin signed the new contract and gave Mr. Wolfe a check for $150,000 as a deposit. They agreed a large deposit was necessary to purchase all the materials upfront, given the COVID-19 pandemic and spike in wood prices.

{¶14} The contract contained a provision providing, "THIS CONTRACT constitutes the entire understanding of the parties and no other understanding, collateral or otherwise, shall be binding unless in writing signed by both parties. If this contract is broken by the BUYER or PURCHASER, he (or she) agrees to forfeit any cash down payment made, (UP TO A MAXIMUM OF 00.00% OF SALES PRICE + EXPENSES)."

{¶15} After signing the contract and paying the deposit, Mr. McLaughlin heard from Mr. Wolfe intermittently for a few months, and each time Mr. Wolfe had yet to purchase any of the materials. Meanwhile, Mr. McLaughlin was digging the site to get it prepared. Later that fall, Mr. Wolfe's mason arrived at the construction site and put stake corners in the ground. At that time, Mr. McLaughlin and Mr. Wolfe got into a heated argument. Mr. McLaughlin attempted to fire Mr. Wolfe over the lack of materials. The McLaughlins had been excavating the site and were hoping to pour the concrete before the oncoming winter. The mason left during the argument and never returned. Mr. McLaughlin's son, Justin, broke up the argument. Mr. McLaughlin could not complete the excavation because Mr. Wolfe did not supply any of the materials for the drains.

4

{¶16} Sometime that fall, Mr. Wolfe informed Mr. McLaughlin that the job would "run better" if they had professional drawings and referred Mr. McLaughlin to his "architect friend," Robert Brown ("Mr. Brown"). In late spring, Mr. McLaughlin decided to have Mr. Brown do the drawings, and he paid him $4,000.

{¶17} By that time, the price of wood had spiked dramatically, and Mr. Brown suggested using ICF (insulated concrete form) building blocks, which are stronger and more durable than wood. Mr. McLaughlin later discovered Mr. Brown was not a licensed architect. He took Mr. Brown's designs to a licensed architect to ensure the structure was sound, especially since he was switching the building materials from wood to ICF, and to get the designs certified and stamped, paying another $900.

{¶18} By late summer 2021, the McLaughlins decided to cancel their contract with Mr. Wolfe since he had not responded or provided any materials. After some back and forth via text and email, the McLaughlins tried calling Mr. Wolfe. Mr. Wolfe reported them to the Hudson Police Department for telephone harassment.

{¶19} The McLaughlins' attorney called the AG to file a complaint against Mr. Wolfe. Ms. Gregory, an investigator in the consumer protection division, testified on direct examination that the AG had filed civil lawsuits against Mr. Wolfe in 2003, 2017, and 2021 based on similar customer complaints. The pending 2021 Cuyahoga County case consisted of six consumers who had contracted with Mr. Wolfe and either did not "have the work done, or it was halfway done or partially done or shoddy workmanship."

{¶20} She advised the McLaughlins to file a police report based on her investigation of Mr. Wolfe's bank records and because Mr. Wolfe had performed no work on the contract. Ms. Gregory already had Mr. Wolfe's bank records and cancelled checks since she had several ongoing investigations against him, including the 2021 Cuyahoga

5

County case.  While the McLaughlins' $150,000 had been deposited in Mr. Wolfe's business bank account, he commingled his business and personal funds, and she determined he never used any of the money on the McLaughlins' project.  When Mr. Wolfe deposited the McLaughlins' check into his account, he had a balance of approximately $4,000 to $6,000.  The records demonstrated that the deposit was used to pay approximately $54,000 in personal loans.

{¶21} On cross-examination, Ms. Gregory further testified that the 2021 Cuyahoga case was still pending, with a preliminary injunction issued to prevent Mr. Wolfe from holding himself out as a contractor and two findings of contempt in violation of that injunction.  Mr. McLaughlin testified at one of two contempt hearings in the 2021 Cuyahoga County case.  According to Ms. Gregory, Mr. McLaughlin testified that there were no conditions precedent in his contract with Mr. Wolfe that had to be completed before Mr. Wolfe began the project and/or purchased the materials.

{¶22} On redirect, Ms. Gregory explained she has seen 50 or more complaints against Mr. Wolfe in the past 20 years.

{¶23} On September 6, 2021, the McLaughlins decided to press criminal charges against Mr. Wolfe, and they reported the incident to the Portage County Sheriff's Office.

{¶24} The state admitted into evidence the parties' contract, a copy of the $150,000 check, the stamped conceptual rendering design of the structure, and a Snapchat video Jason took of the excavation he and Mr. McLaughlin completed in October 2020.

### *The Defense*

{¶25} The defense presented the testimony of Mr. Wolfe.

6

Case No. 2023-P-0017

{¶26} Mr. Wolfe explained that this was a breach of contract issue, not a criminal matter. He did not believe he was required to purchase materials with the deposit per the terms of the contract, which was a "fixed-price contract." Rather, the $150,000 was due on signing and represented his earned profit. He worked over 200 hours on the project, and he paid himself first as per his accounting practices. Any volatility in the price of materials would "eat his profit" and was a result of the COVID-19 pandemic prices being abnormally high. When Mr. McLaughlin told him later he wanted to switch the materials to ICF, Mr. Wolfe was under the impression the contract was cancelled since it was a "change order." He did not return the money because he "was ready, willing, and able to perform" and he was "entitled to my profit." In addition, the contract had no termination date.

{¶27} He further claimed there were conditions precedent before he was required to perform his "end of the deal." Mr. McLaughlin was supposed to move the gas lines, do the excavation, create the footers, put in the drain tile and the vertical rebar, and get an inspection prior to his bringing in the concrete. The gas company took two and a half months to move the gas lines. Similarly, the footers were never completed. In addition, Mr. McLaughlin mentioned radiant floor heating, which must be placed before the concrete is poured.

{¶28} Mr. Wolfe spoke with Mr. McLaughlin probably twice a week for the first 10 to 12 months. In January 2021, he received a text from Mr. McLaughlin informing him that the McLaughlins wanted to do the project themselves. In late August 2021, 13 months into the project, Mrs. McLaughlin called him and terminated the contract. Mr. Wolfe told the McLaughlins he would like to meet when his attorney was in town so they

7

Case No. 2023-P-0017

could negotiate a settlement. He was entitled to a profit since he was not the breaching party.

{¶29} Mr. Wolfe clarified that Mr. Brown is a licensed exterior designer and that plans do not need to be stamped by a licensed architect. He detailed his Better Business Bureau rating ("BBB"), which was always around an "A" until 2019, when the AG came after him due to a "lack of clauses" in his contracts. He never intended to steal, trick, or deceive Mr. McLaughlin, there was no judgment in the 2021 Cuyahoga County case, and he does not have any other convictions. He does not lie, and he has been in the contracting business for over 46 years.

{¶30} During cross-examination, Mr. Wolfe was asked about previous incidents with former clients. Lynn and John VanAuker (the "VanAukers") contracted with Mr. Wolfe for labor for a pole barn for their horses on their property. The VanAukers would provide the materials. Unfortunately, Mr. VanAuker passed away. Several months later, Ms. VanAuker told Mr. Wolfe that she wished to proceed, but this time he would provide the labor and materials. They agreed on a contract price of $45,885 and a deposit of $18,885. Ultimately, the deal "went south," and Mr. Wolfe was convicted of a fifth-degree misdemeanor for unauthorized use of property. In his words, he ended up refunding her the entire amount – not taking the 30% he was owed per their agreement.

{¶31} The state then inquired whether Mr. Wolfe had continued acting as a contractor while under the injunction in the 2021 Cuyahoga County case prohibiting him from doing any contracting work. He claimed that while he took money and specifications for a project from a client, Jean Holyfield, in October 2022, he did so on the behalf of Wheeler Construction pursuant to the terms of the court's order.

8

Case No. 2023-P-0017

**{¶32}** The state introduced complaints from the BBB website that were made against Mr. Wolfe for failing to perform, failing to file permits, overcharging products, and poor workmanship. The printed BBB information also reflected that Mr. Wolfe has an "F" rating. The state also introduced text messages and emails between the McLaughlins and Mr. Wolfe that reflected the McLaughlins sought the return of their deposit and that Mr. Wolfe disagreed any money was owed or that materials needed to be purchased from the deposit.

### *State's Rebuttal Witness*

**{¶33}** The state presented a rebuttal witness following the close of the defense's case. Briana Longstreth ("Mrs. Longstreth") testified that in June 2021 she purchased a home with her husband. They were expecting a baby and decided to build an addition to their new home. In July 2021, they posted on a website to solicit bids, and Mr. Wolfe responded. Mr. Wolfe was very kind and assured them the project would be completed within their timeline.

**{¶34}** Once the Longstreths signed the contract, which was written by Mr. Wolfe, and gave Mr. Wolfe a deposit of $94,000, Mr. Wolfe "changed completely." He became unresponsive and would not answer their calls or text messages. Mrs. Longstreth's understanding was that the deposit was for the excavation of the basement, the blockwork, the concrete, and delivery of the lumber because Mr. Wolfe told them the prices of lumber would be rising.

**{¶35}** In January 2022, the excavation began through an excavator they knew personally, whom they connected with Mr. Wolfe. The excavation did not go well because the plans and the drawings did not match. The plans were drawn by Mr. Brown, who was referred by Mr. Wolfe. Later, they discovered the plan lacked specifications and

9

contained structural issues. The excavator had to return to dig deeper at an additional cost. After the excavation, the Longstreths discovered that Mr. Wolfe did not obtain a necessary permit, and the hole that was dug was too close to the property line to pass the zoning requirements. The hole stood open for so long that it was exposed to rainfall, which flooded their existing basement.

{¶36} The Longstreths later learned Mr. Wolfe's business was in receivership and only $25,000 out of the $94,000 had been set aside for their project. They were able to collect only $5,000 from Mr. Wolfe's bond. At the time of the jury trial, the Longstreths were still in the process of building the addition to their home.

### *Jury Verdict and Sentencing*

{¶37} Prior to closing arguments, the state requested that the limiting instruction for "other acts evidence" be removed from the proposed instructions since they introduced the evidence in rebuttal to Mr. Wolfe's testimony. While defense counsel did not "necessarily agree" the state did not use other-acts evidence during its case-in-chief, he did not object to the removal of the instruction.

{¶38} The jury found Mr. Wolfe guilty of one count of grand theft, a third-degree felony, in violation of R.C. 2913.02.

{¶39} In March 2023, after a presentence investigation, the trial court held a sentencing hearing at which Mr. Wolfe was sentenced to a term of 36 months in prison and ordered to pay $150,000 in restitution.

{¶40} Mr. Wolfe raises two assignments of error for our review:

{¶41} "[1.] The trial court erred as a matter of law when it allowed evidence of Wolfe's prior acts evidence in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and Article I, Sections 1, 10 & 16 of the Ohio Constitution.

10

Case No. 2023-P-0017

{¶42} "[2.] Wolfe's conviction is against the manifest weight of the evidence in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and Article I, Sections 1, 10 & 16 of the Ohio Constitution."

### Other-Acts Evidence

{¶43} In his first assignment of error, Mr. Wolfe contends the trial court erred by allowing other-acts evidence pursuant to Evid.R. 404(B) and R.C. 2945.59 that were not relevant to the facts and prejudiced the jury.

{¶44} "The admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that we review de novo." *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 117. "But the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant pursuant to Evid.R. 403(A) involves an exercise of judgment and will be reviewed for an abuse of discretion." *Id.*

{¶45} "Evidence of other acts may not be used to prove by inference that the accused acted in conformity with those other acts or that he or she has a propensity to act in that way." *Worley* at ¶ 118; Evid.R. 404(B).

{¶46} "Other-acts evidence may be admissible for nonpropensity purposes—i.e., as 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Worley* at ¶ 118; *see* R.C. 2945.59 ("any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved * * *, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant").

11

Case No. 2023-P-0017

{¶47} "To justify the admission of other-acts evidence for a nonpropensity purpose, the evidence must pertain to a "'material' issue that is actually in dispute.'" *Worley* at ¶ 118, quoting *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 27, quoting *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

{¶48} Mr. Wolfe contended that he did not commit a crime and that this was purely a contractual dispute. "Other-acts evidence is admissible to negate a defendant's claim of mistake or accident with respect to the commission of the alleged crime; such evidence tends '[t]o show, by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge.'" *Hartman* at ¶ 52, quoting McCormick, *Evidence*, Section 190, at 804 (4th Ed.1994).

{¶49} The state contended that the testimony of Ms. Longstreth and evidence from Mr. Wolfe's other clients, such as Mrs. VanAuker and Ms. Holyfield, demonstrated Mr. Wolfe's "modus operandi" or "method of working," i.e., he enters into contracts with people, promises great work, and fails to perform, keeping the deposits. However, "method of working" is more akin to using other-acts evidence to show intent and absence of mistake. "Modus operandi" evidence is evidence of "signature, fingerprint-like characteristics unique enough 'to show that the crimes were committed by the same person.'" *Hartman* at ¶ 37, quoting Weissenberger, *Federal Evidence*, Section 404.17 (7th Ed.2019). In other words, "modus operandi" is concerned with identifying the perpetrator, and Mr. Wolfe's identity was already known and not a material issue. In any case, the state's other-acts evidence was admissible to prove he defrauded other customers the same way with a similar intent and that this was not a mere dispute over "contract clauses," which was a material issue at trial.

12

{¶50} Although the state intended to use this evidence in its case-in-chief, it presented the testimony of Ms. Longstreth as a rebuttal witness and cross-examined Mr. Wolfe regarding his other victims. In these incidents, Mr. Wolfe answered solicited bids, wrote the contracts, and took deposits with the customer's understanding that at least a portion would be used to purchase materials. Once Mr. Wolfe received the deposit, however, little work was performed, and no materials were purchased. Mr. Wolfe also recommended the same "architect," Mr. Brown. The facts surrounding these incidents establish a similar method of operation to that in this case, making the other-acts evidence probative that the act in question was not performed "'inadvertently, accidentally, involuntarily, or without guilty knowledge.'" *Hartman* at ¶ 52, quoting McCormick, *Evidence*, Section 190, at 804.

{¶51} Mr. Wolfe also contends that Ms. Gregory's testimony was irrelevant to the instant case since it regarded the pending litigation in the 2021 Cuyahoga County case. Our review, however, reveals the contrary. Ms. Gregory's testimony was relevant since the AG was part of the McLaughlin investigation that led to criminal charges being filed against him. The state's brief mentions the AG's familiarity with Mr. Wolfe was not offered to prove Mr. Wolfe's character. Ms. Gregory had already been investigating Mr. Wolfe when the McLaughlins contacted her. Because she was in possession of Mr. Wolfe's bank records, she discovered that after Mr. Wolfe deposited the McLaughlins' deposit, he paid approximately $54,000 in personal loans and failed to purchase any materials. Mr. Wolfe had the opportunity to cross-examine Ms. Gregory, and both he and Ms. Gregory testified the Cuyahoga County case was pending with no verdict against him. Most fundamentally, he did not object to the trial court's exclusion of a limiting jury instruction during an explicit discussion of the jury instructions toward the end of trial.

13

**{¶52}** Mr. Wolfe asserts that even if the other-acts evidence was admissible under Evid.R. 404(B), it was inadmissible under Evid.R. 403(A), which "requires a trial court to exclude relevant evidence if 'its probative value is substantially outweighed by the danger of unfair prejudice.'" *Worley* at ¶ 124, quoting Evid.R. 403(A).

**{¶53}** In *Worley*, the Supreme Court of Ohio explained that "[t]he exclusion of relevant evidence under Evid.R. 403(A) requires more than mere prejudice, because anything adverse to a party's case could be deemed prejudicial to that party. *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23 (Evid.R. 403(A) requires exclusion only of 'evidence that is *unfairly* prejudicial' [emphasis sic])." *Id.* at ¶ 125. The court has held:

**{¶54}** "'"Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.'" *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting Weissenberger, *Ohio Evidence*, Section 403.3, at 85-87 (2000)." *Id.*

**{¶55}** Just as in *Worley*, the probative value of the other-acts evidence was high, and Mr. Wolfe has not shown that the evidence unfairly prejudiced him or appealed to the jury's emotions. *See Worley* at ¶ 126. The evidence was directly probative of a material issue in dispute, namely, intent and/or lack of mistake.

**{¶56}** In addition, Mr. Wolfe cannot now complain about other-acts evidence when he opened the door through his own testimony. The doctrine of invited error precludes a defendant from making an affirmative and apparent strategic decision at trial and then

14

complaining on appeal that the result of that decision constitutes reversible error. *State v. Doss*, 8th Dist. Cuyahoga No. 84433, 2005-Ohio-775, ¶ 7.

**{¶57}** Mr. Wolfe's first assignment of error is without merit.

### Manifest Weight of the Evidence

**{¶58}** In his second assignment of error, Mr. Wolfe contends his conviction is against the manifest weight of the evidence because the evidence reflected a contractual dispute rather than a crime of grand theft.

**{¶59}** A court reviewing the manifest weight of the evidence observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 WL 738452, *5 (Dec. 23, 1994). A challenge to the weight of the evidence requires a court to consider whether the state met its burden of persuasion. *State v. McFeely*, 11th Dist. Ashtabula No. 2008-A-0067, 2009-Ohio-1436, ¶ 78.

**{¶60}** Mr. Wolfe contends there was ample evidence of a dispute regarding the conditions precedent in the contract by way of Justin's testimony and Mr. Wolfe's testimony. However, the state's evidence revealed a more sordid story that the jury was free to believe, i.e., Mr. Wolfe answered the McLaughlins' solicitation for bids for a construction project, promised to perform, took the McLaughlins' deposit, represented that the price of materials would be rising, and failed to perform the work or purchase any materials. The evidence further revealed this is Mr. Wolfe's pattern of dealing; he even recommended the same "exterior designer."

15

{¶61} As we have often stated, simply because the jury believed the state's version of events rather than the defendant's version does not mean the jury lost its way. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). This is because the trier of fact "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 58.

{¶62} Mr. Wolfe's second assignment of error is without merit.

{¶63} The judgment of the Portage County Court of Common Pleas is affirmed.

MATT LYNCH, J.,

ROBERT J. PATTON, J.,

concur.

16

Case No. 2023-P-0017