[Cite as *State v. Morgan*, 2025-Ohio-5326.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                                  :
                                               :     C.A. No. 30385
    Appellee                               :
                                               :     Trial Court Case No. 2024-CRB-4034
v.                                             :
                                               :     (Criminal Appeal from Municipal Court)
TYRONE MORGAN                                  :
                                               :     **FINAL JUDGMENT ENTRY &**
    Appellant                              :     **OPINION**
                                               :

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on November 26, 2025, the judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with the opinion.

Costs to be paid as follows: 50% by the Appellant and 50% by the Appellee.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

RONALD C. LEWIS, JUDGE

TUCKER, J., and HUFFMAN, J., concur.

**OPINION**

ARVIN S. MILLER, Attorney for Appellant
MARIE POINSATTE, Attorney for Appellee

LEWIS, J.

{¶ 1} Defendant-Appellant Tyrone Morgan appeals from a judgment of conviction for domestic violence in the Dayton Municipal Court following a bench trial.   For the following reasons, we affirm the judgment of the trial court in part, reverse in part, and remand for resentencing.

### I.    Facts and Course of Proceedings

{¶ 2} On December 19, 2024, a complaint was filed charging Morgan with one count of aggravated menacing, in violation of R.C. 2903.21, a misdemeanor of the first degree; one count of disorderly conduct, in violation of R.C. 2917.11, a misdemeanor of the fourth degree; and one count of domestic violence, in violation of R.C. 2919.25(C), a misdemeanor of the fourth degree.   Morgan pleaded not guilty to the charges, and the case proceeded to a bench trial.

{¶ 3} S.M., Morgan's sister, testified that she lived on Bruce Avenue in an apartment with Morgan and her boyfriend, G.S.   S.M. had been dating and living with G.S. for 31 years. Although the couple never married, S.M. and G.S. considered themselves to be "common law married."   Morgan had been living with them for about a year.   Morgan slept on a mattress in the living room and his personal items were in the basement where he had made a room for himself.

{¶ 4} On December 18, 2024, S.M. was at home putting laundry away in the hallway. Morgan was in the bathroom where he was cleaning out some old glass Coke bottles he

had found. Morgan was a scrapper and went through garbage to find things that he could use or sell. G.S. was in the living room watching television and listening to music. G.S. called S.M. into the living room and said that Morgan was bringing more junk into the house and told her to look out the front door. When she did, S.M. saw a big gas can. S.M. told Morgan that he could not bring the gas can into the apartment, which caused everyone to start yelling. Morgan yelled at S.M. so G.S. got mad and told Morgan that he was disrespecting S.M.

{¶ 5} S.M. heard Morgan yelling about G.S. and cursing and saw Morgan moving his arms around. S.M. also heard G.S. yelling while he was sitting on the couch. S.M. told them to stop arguing but they did not stop. S.M. went back into her bedroom and did not see what happened but heard Morgan curse and tell G.S. that he was "going to get [him]." Trial Tr. 30. Next thing she knew, G.S. had called the police.

{¶ 6} S.M. acknowledged that Morgan threatened to hurt G.S. but stated that she was used to Morgan making threats to hurt somebody. When Morgan threatened to hurt G.S., S.M. got quiet and tried to listen but did not want to get involved and get hurt. She did not believe that Morgan would hurt G.S. and figured that the argument would pass.

{¶ 7} G.S. testified that he lived in the apartment on Bruce Avenue with his wife of 30 years, S.M. G.S. knew Morgan for about 25 years and Morgan had been living with them for about 7 months. Morgan stayed in the living room.

{¶ 8} G.S. testified that on the night of the incident, he was home watching television and listening to music. S.M. was in the bedroom when Morgan came home about 7:00 p.m. When Morgan came into the apartment, he had some old classic pop bottles with him that Morgan and G.S. discussed. Morgan also came home with a gas can that he left in the hallway outside the apartment door. Morgan went into the bathroom to wash off the pop

3

bottles and G.S. saw S.M. putting away the linens in the hallway. G.S. had seen the gas can outside the front door when Morgan came home so he tried to get S.M.'s attention when he saw her. He wanted her to see what Morgan had brought home.

{¶ 9} When S.M. saw the gas can, she told Morgan he could not bring it inside. S.M. and G.S. were concerned about Morgan bringing things home that might have bed bugs in them and had told him not to bring home similar items. When S.M. mentioned to Morgan not to keep bringing things inside, Morgan began cursing, carrying on, walking back and forth, and being loud. G.S. claimed that Morgan was so loud that "the whole building could hear him." Trial Tr. 46. Morgan would get very loud when he got angry and would say a lot of gibberish. G.S. explained that by gibberish he meant that Morgan mumbled so that often no one could understand what he was saying. G.S. denied yelling back at Morgan but stated they were arguing in the living room.

{¶ 10} Morgan then picked up the gas can and took it outside the apartment building, but G.S. could still hear Morgan yelling outside because Morgan was located right by the windows. G.S. could tell that Morgan was very mad at him because Morgan said, "Oh I know [G.S.] said something," and then said, "that's the reason I cannot stand his ass and I'm going to kill him." Id. at 47. He then heard Morgan say, "I'm going to kill you one of these days." Id. These statements alarmed G.S., and he believed Morgan would hurt him. The month prior, G.S. had seen Morgan bring home a silver and white .22 pistol, which caused G.S. to believe that Morgan would try to kill him. When Morgan came back into the apartment, G.S. told him that he was tired of Morgan disrespecting him and S.M. He told Morgan to take his belongings and get out.

{¶ 11} Dayton Police Officer Kevin Miller testified that he responded to a call on Bruce Avenue for a domestic complaint. He was wearing the uniform of the day, which included

4

the use of a body camera. When he arrived at the apartment building, he spoke with the 911 callers, S.M. and G.S., who lived on the first floor of the apartment building. He then located Morgan in the basement and spoke with him. Morgan appeared very agitated. Morgan identified S.M. as his sister and G.S. as his brother-in-law and stated that he had lived with them for about six months.

{¶ 12} Morgan claimed that G.S. had approached his office in the basement and kicked the door. He further alleged that G.S. was threatening him with a hatchet. Officer Miller did not see any damage to the door and did not locate a hatchet. He also did not see any guns.

{¶ 13} At the conclusion of trial, Morgan was found guilty of domestic violence and disorderly conduct, but not guilty of aggravated menacing. The trial court immediately proceeded to sentencing, at which the court merged the offenses of domestic violence and disorderly conduct. The State elected to sentence on the domestic violence charge. The trial court imposed a sentence of 30 days in jail with credit for 17 days and the remaining jail time suspended. Morgan was further ordered to complete three months of non-reporting community control.

{¶ 14} On January 16, 2025, Morgan filed a motion asking the court to reconsider its decision finding Morgan guilty of domestic violence, arguing that he did not meet the definition of family or household member under the statute. The trial court denied his motion.

{¶ 15} Morgan filed a timely notice of appeal.

## II. Sufficiency of the Evidence

{¶ 16} Morgan raises a single assignment of error, which states:

5

The trial court erred in convicting Tyrone Morgan of domestic violence pursuant to R.C. 2919.25(C), as there was legally insufficient evidence as to the necessary required element that the complainant and Tyrone Morgan be family or household members to support the charge.

{¶ 17} "A claim raising the sufficiency of the evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 2011-Ohio-4215, ¶ 219, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "The test for sufficiency of the evidence is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Worley*, 2021-Ohio-2207, ¶ 57, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 18} Morgan was convicted of R.C. 2919.25(C), which states that "[n]o person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." A "family or household member" is defined, in relevant part, as anyone who is residing or has resided with the offender and is:

(i) A spouse, a person living as a spouse, or a former spouse of the offender;

(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;

(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.

R.C. 2919.25(F)(1)(a).

6

{¶ 19} The parties agree that Morgan and S.M. are related by consanguinity and that Morgan resided with G.S. and S.M. at their apartment at the time of the incident. The dispute on appeal is whether G.S. constitutes a family or household member under R.C. 2919.25(F)(1)(a)(ii). According to Morgan, he was not related to G.S. through affinity because G.S. and S.M. were never married. The State, however, argues that G.S. and S.M. were living together as spouses for over 30 years, which created a relationship between Morgan and G.S. that falls within the category of relationships the domestic violence statute was intended to protect.

{¶ 20} The statute does not define the term "affinity." "When a term is not defined in the statute, we give the term its plain and ordinary meaning." *Lingle v. State*, 2020-Ohio-6788, ¶ 15, citing *Brecksville v. Cook*, 75 Ohio St.3d 53, 56 (1996). "In determining the plain and ordinary meaning of a word, courts may look to dictionary definitions of the word as well as the 'meaning that the word[ ] ha[s] acquired when . . . used in case law.'" *State v. Bertram*, 2023-Ohio-1456, ¶ 13, quoting *Rancho Cincinnati Rivers, L.L.C. v. Warren Cty. Bd. of Revision*, 2021-Ohio-2798, ¶ 21. If words have acquired a particular meaning, we construe them accordingly. R.C. 1.42.

{¶ 21} "Affinity" is defined in relevant part as "[t]he relation that one spouse has to the blood relatives of the other spouse; relationship by marriage." *Black's Law Dictionary* (12th Ed. 2024). "Affinity is the relationship which arises from marriage between one of the spouses and the blood relations of the other. . . ." *Chinn v. State*, 47 Ohio St. 575 (1890), syllabus. Accordingly, "'relationships by affinity are generally those created by marriage, such as father-in-law or mother-in-law, or stepparent.'" *State v. Powell*, 2024-Ohio-4923, ¶ 15 (2d Dist.), quoting *In re K.P.R.*, 2011-Ohio-6114, ¶ 24 (12th Dist.), citing *In re LaPiana*,

2010-Ohio-3606 (8th Dist.) (Rocco, P.J., dissenting on a separate issue). Based on these definitions and common uses, affinity is a relationship created through marriage.

{¶ 22} G.S. testified he and S.M. had been married for 30 years and that Morgan was his brother-in-law. However, S.M. clarified that she and G.S. had never been married but considered themselves to be in a common law marriage. Although S.M. and G.S. considered themselves married, Ohio has not recognized common law marriage since 1991. R.C. 3105.12(B)(1). Therefore, Morgan is not related to G.S. by marriage and G.S. does not qualify as a family or household member.

{¶ 23} It is true that the General Assembly clearly intended to offer protection to a wide class of people under the domestic violence statute. *State v. Carswell*, 2007-Ohio-3723, ¶ 32. Nevertheless, we are constrained by the plain language of the statute, which encompasses only those individuals specifically identified by the legislature. In this case, G.S. does not fall into any of the defined categories of family or household member.

{¶ 24} We also acknowledge the State's argument that there is an inconsistency in the application of the domestic violence statute in that had G.S. committed the offense against Morgan, it would have constituted domestic violence, i.e., Morgan would have qualified as a person related through consanguinity to a person living as a spouse of the offender. R.C. 2919.25(F)(1)(a)(iii). But where statutory language is unambiguous, as is the case here, we must apply it as written without resorting to rules of statutory interpretation or considerations of public policy. *Gabbard v. Madison Local School Dist. Bd. of Edn.*, 2021-Ohio-2067, ¶ 13, citing *Zumwalde v. Madeira & Indian Hill Joint Fire Dist.*, 2011-Ohio-1603, ¶ 23-24, 26.

{¶ 25} Having reviewed the evidence in the light most favorable to the State, we conclude that the evidence was insufficient to prove that G.S. was a family or household

8

member. Therefore, we sustain Morgan's sole assignment of error and vacate Morgan's conviction for domestic violence.

{¶ 26} Morgan was also found guilty of disorderly conduct, a finding not challenged on appeal. Consequently, we affirm the trial court's judgment to the extent it found Morgan guilty of disorderly conduct.

### III. Conclusion

{¶ 27} Having sustained the sole assignment of error, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for the trial court to sentence Morgan on the disorderly conduct charge.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.